No.  90-144

IN THE SUPREME COURT OF THE STATE OF MONTANA

1990

STATE OF MONTANA ex rel MARC RACICOT,
Attorney General for the State of Montana,
                    Relator

    -vs-

THE DISTRICT COURT OF THE FIRST JUDICIAL
DISTRICT OF THE STATE OF MONTANA, in and
for the County of Lewis and Clark, and
the Honorable Thomas C. Honzel, District
Judge,
                    Respondent.

ORIGINAL PROCEEDING:  Supervisory Control

FILED

MAY 17 1990

Ed Smith
CLERK OF SUPREME COURT
STATE OF MONTANA

COUNSEL OF RECORD:

        For Relator:

            Marc Racicot, Attorney General, Helena, Montana
            Elizabeth S. Baker, Asst. Attorney General, Helena,
            Montana

        For Respondent:

            Garth B. Jacobson, Chief Counsel, Secretary of
            State, Helena, Montana
            Patrick Melby, Luxan & Murfitt, Helena, Montana

                            Submitted:  March 29, 1990

                            Decided:  May 17, 1990

Filed:

_____
            Clerk

Justice Fred J. Weber delivered the Opinion of the Court.

The Montana Attorney General petitioned for a writ of supervisory control requesting immediate review of a writ of mandamus issued by the First Judicial District Court, Lewis and Clark County. The District Court ordered the Secretary of State to accept filings for election to a Montana Supreme Court position and two district court positions with terms that will expire at the end of this year. The District Court held that Art. VII, Sec. 7 and Sec. 8, Mont. Const., require the nominees currently filling the positions to stand for election at the general election preceding the expiration of the term to which nominated even though the Senate had not yet been in session and therefore had not confirmed the nominations. We accept jurisdiction, issue the writ of supervisory control, and vacate the District Court's writ of mandamus.

The Montana Attorney General's petition for writ of supervisory control raises the following issues:

1. Should the Montana Supreme Court accept jurisdiction and issue a writ of supervisory control when the District Court's interpretation of Art. VII, Sec. 7 and Sec. 8, Mont. Const., required judicial elections with a filing deadline of March 30, 1990?

2. Do Art. VII, Sec. 7 and Sec. 8, Mont. Const., require the Secretary of State to place Montana Supreme Court Justice Position Number One, Thirteenth Judicial District Department Four, and Eighteenth Judicial District Department Two on the 1990 ballot when the Governor filled the positions by nominations and the Senate had

not been in session and had no opportunity to confirm those nominations?

On August 31, 1989, Justice L. C. Gulbrandson retired from Montana Supreme Court Justice Position Number One. Had he completed the term, it would have expired on January 6, 1991, see § 3-2-103, MCA, with primary election for his successor on June 5, 1990, see § 13-1-107, MCA, and a filing deadline of March 22, 1990, see § 13-10-201(6), MCA. Governor Stephens nominated District Court Judge Diane Barz to fill the vacant seat. The Governor also nominated Maurice Colberg, Jr., to a similar vacancy in Department Four of the Thirteenth Judicial District and Larry W. Moran to a similar vacancy in Department Two of the Eighteenth Judicial District. Because the Senate has not been in session since the foregoing nominations, it has been unable to consider confirmation of the nominations.

On March 14, 1990, Gene Huntley attempted to file with the Secretary of State a Declaration for Nomination for Justice Position Number One. The Secretary of State rejected Mr. Huntley's declaration stating he was bound by 42 Att'y Gen. Op. 31. That opinion concluded that no election for a judicial position can occur until the Senate has confirmed a serving nominee.

Mr. Huntley then petitioned the District Court for a writ of mandamus. The Court ordered the Secretary of State to either file Mr. Huntley's declaration or to show cause why it had not been filed by the hearing date of March 20, 1990. The Attorney General was granted permission to intervene. At the show cause hearing, the District Court orally granted Mr. Huntley's petition and

3

ordered the Secretary of State to accept the declaration. The Court also extended the filing date for election to the affected judicial offices from March 22, 1990, to March 30, 1990, but reserved the question of Mr. Huntley's request for costs and attorney fees for further consideration.

In response, the Attorney General petitioned this Court for a writ of supervisory control asking that the District Court's writ of mandamus be dissolved. Mr. Huntley filed a brief on behalf of the First Judicial District Court and counsel for Mr. Huntley argued. For convenience we will refer to the Respondent as Mr. Huntley. As custodian of the election process, the Secretary of State intervened on behalf of Montana voters. On March 29, 1990, this Court issued a writ of supervisory control reversing and vacating the District Court's ruling. Because of the impending filing dates, we reserved our written opinion until a later date.

I.

Should the Montana Supreme Court accept jurisdiction and issue a writ of supervisory control when the District Court's interpretation of Art. VII, Sec. 7 and Sec. 8, Mont. Const., required judicial elections with a filing deadline of March 30, 1990?

In considering whether to accept jurisdiction under a writ of supervisory control, this Court has always proceeded on a case-by-case basis and has granted the writ in diverse circumstances. We have issued the writ to further judicial economy and to prevent procedural entanglements. In many cases we have issued the writ to prevent an injustice to the petitioner which would arise if the

4

petitioner were forced to await appeal. Often the particular facts of the case required immediate review to prevent a gross injustice or to prevent deprivation the petitioner's fundamental rights while awaiting appeal. See State v. District Court of the Eighth Judicial Dist. (1985), 217 Mont. 106, 114, 703 P.2d 148, 153-54.

The present case does not fit squarely into any of the previous situations in which we have granted supervisory control. We do believe, however, that it is appropriate. The District Court's decision directly affects Montana voters' constitutional right to elect Supreme Court Justices and District Court Judges. It affects the right of judicial candidates to run for those offices and the right of the current nominees to occupy those offices. The impending filing deadline and the dates of the 1990 primary and general elections make appeal an inadequate remedy. Potential candidates for the offices must know whether they are required to file and whether they must begin their election campaigns. For these reasons, we accept appellate jurisdiction and issue the writ of supervisory control.

II.

Do Art. VII, Sec. 7 and Sec. 8, Mont. Const., require the Secretary of State to place Montana Supreme Court Justice Position Number One, Thirteenth Judicial District Department Four, and Eighteenth Judicial District Department Two on the 1990 ballot when the Governor filled the positions by nominations and the Senate had no opportunity to confirm those nominations?

The following constitutional provisions are at issue in this case. Art. VII, Sec. 7(2), Mont. Const., provides in pertinent part:

> Terms of office shall be eight years for supreme court justices [and] six years for district court judges . . . .

Art. VII, Sec. 8, Mont. Const. provides as follows:

> (1) The governor shall nominate a replacement from nominees selected in the manner provided by law for any vacancy in the office of supreme court justice or district court judge. If the governor fails to nominate within thirty days after receipt of nominees, the chief justice or acting chief justice shall make the nomination. Each nomination shall be confirmed by the senate, but a nomination made while the senate is not in session shall be effective as an appointment until the end of the next session. If the nomination is not confirmed, the office shall be vacant and another selection and nomination shall be made.

> (2) If, at the first election after senate confirmation, and at the election before each succeeding term of office, any candidate other than the incumbent justice or district judge files for election to that office, the name of the incumbent shall be placed on the ballot. If there is no election contest for the office, the name of the incumbent shall nevertheless be placed on the general election ballot to allow voters of the state or district to approve or reject him. If an incumbent is rejected, another selection and nomination shall be made.

> (3) If an incumbent does not run, there shall be an election for the office.

A.

## Ambiguity

We first consider the meaning of the first sentence of subsection (2) of Art. VII, Sec. 8, Mont. Const. which states:

> If, at the first election after senate confirmation, and
> at the election before each succeeding term of office,
> any candidate other than the incumbent justice or
> district judge files for election to that office, the
> name of the incumbent shall be placed on the ballot.

The Attorney General argues that the plain language of the sentence requires elections for the judicial seats only after Senate confirmation of the nominees. In his interpretation, the language, "and at the election before each succeeding term of office," is a subordinate clause referring to the phrase "at the first election after senate confirmation." Because the nominations have not been presented to the Senate, and therefore have not been confirmed, he argues that there should be no election in 1990. Thus, if confirmation does not take place until the legislature meets in 1991, the plain language requires the first elections to take place in 1992.

In contrast, Mr. Huntley argues that the plain language mandates an election on the expiration of every judicial term. He understands the sentence to refer to two different situations. The first is covered by the clause "at the first election after senate confirmation." He points out that it is set off by commas, and, therefore, is independent of the second clause, requiring mid-term appointees confirmed by the Senate to run at the next general election for the unexpired term. The second situation is covered by the clause "at the election before each succeeding term of office." Mr. Huntley asserts that the "and" connecting the two clauses is a coordinating conjunction, not a subordinating conjunction, and should be read as "or." The clause, "the election

7

before each succeeding term of office," refers to the eight-year and six-year terms of office set out in Art. VII, Sec. 7(2), Mont. Const. Therefore, he reasons, a judicial office is up for election at the general election prior to the expiration of its term even if the office is filled by an unconfirmed nominee. He concludes that, in the present case, the unconfirmed nominees must stand for election in 1990.

The basic conflict in the parties' interpretations arises from the phrase "succeeding term of office." Does it refer to terms which are to be succeeding terms after the first election following Senate confirmation or does it refer back to the eight- and six-year terms described in Art. VII, Sec. 7, Mont. Const.? In resolving disputes of constitutional construction, this Court applies the rules of statutory construction. Under those rules, the intent of the framers of the Constitution is controlling and that intent must first be determined from the plain language of the words used. Butte-Silver Bow Local Gov't. v. State (Mont. 1989), 768 P.2d 327, 330, 46 St.Rep. 87, 90. From the plain language of Art. VII, Sec. 8(2), Mont. Const., the Attorney General's and Mr. Huntley's interpretations both appear to be plausible. We therefore conclude that the sentence is ambiguous as to the present issue.

The parties raise a number of well-argued contentions in support of their respective positions. We will consider each of these in turn.

B.

Holdovers

8

Mr. Huntley argues that under this Court's interpretations of the 1889 Constitution an appointee to a vacant judicial office may not holdover, remain in office, after the term expires unless specifically authorized by a statute or the Constitution. Because the Constitution does not authorize holdovers for either Supreme Court or District Court positions, he reasons that elections must be held to fill the succeeding terms of office.

We agree with Mr. Huntley's first premise, but not with his second, and therefore, not with his conclusion. In Montana, the general rule for holdovers prior to enactment of the 1972 Constitution was stated as:

> [O]ne who is appointed to fill a vacancy in an elective office fills out the unexpired term only, unless by virtue of the express wording of the Constitution or statute he may hold over until his successor is elected and qualified.

State ex rel. Morgan v. Knight (1926), 76 Mont. 71, 79, 245 P. 267, 270.

The Constitution expressly provides for the holding over of Supreme Court Justices and District Court Judges. Even under the annual legislative sessions envisioned by the 1972 Constitutional Convention delegates, see Art. V, Sec. 6, Mont. Const. (1972), holdovers would have occurred. The annual sessions began on the first Monday of January and ran sixty legislative days into the first week of March. Art. V, Sec. 6, Mont. Const.; § 43-205, RCM (1947). The eight-year and six-year terms of Supreme Court and District Court offices expired on the day before the first Monday of January. Section 93-201, RCM (1947); § 93-307, RCM (1947).

9

This statutory chronology virtually guaranteed that certain nominees could not be confirmed by the Senate until after the terms had expired. With the terms expiring on the day before the legislative sessions began, any nomination made after the legislature adjourned in March to fill the final year of a term could not be confirmed until the legislature convened on the first Monday of the following January--the day after the term expired.

The plain language of the 1972 Constitution speaks directly to this situation. Art. VII, Sec. 8(1), Mont. Const. provides that "a nomination made while the senate is not in session shall be effective as an appointment until the end of the next session." By providing that such a nomination would be effective until the end of the next legislative session, the Convention delegates ensured that the Senate would have an opportunity to consider a nominee's confirmation even in the very foreseeable event that the term would expire before the legislature met. We, therefore cannot agree with Mr. Huntley's position that judicial holdovers are not authorized. The present Constitution not only authorizes holdovers, it mandates them.

## C.

### Terms and Tenure

The Secretary of State argues that a holdover in a judicial office violates the Constitution by lengthening the preceding term and shortening the succeeding term contrary to Art. VII, Sec. 7(2), Mont. Const., which mandates eight-year terms for Supreme Court Justices and six-year terms for District Court Judges. In his interpretation, a holdover serves a term of greater than eight or

six years, and the successor must be elected to a term of less than eight or six years.

This Court has already rejected this type of argument because it confuses "term" with "tenure." "Tenure" refers to the time an official actually spends in office, whereas "term" refers to a fixed and definite period of time. The law governing judicial appointees states:

> An appointee confirmed by the senate serves until the next succeeding general election. The candidate elected at that election holds the office for the remainder of the unexpired term.

Section 3-1-1014, MCA (Emphasis added.). The fact that an appointed officer's tenure necessarily extends beyond the end of a statutory term, or impinges on the following term, does not lengthen or shorten the term of office. State ex rel. Olsen v. Swanberg (1956), 130 Mont. 202, 211, 299 P.2d 446, 451.

D.

Public Policy

The Secretary of State argues that since the first sentence of Art. VII, Sec. 8(2), Mont. Const. is ambiguous, our interpretation should be controlled by the strong public policy favoring the election of judicial officials. He and Mr. Huntley cite the Constitutional Convention transcripts to support this policy. The rule is that when the framers' intent cannot be determined from the Constitution's plain words, recourse may be had to the proceedings of the Constitutional Convention. School Dist. No. 12 v. Hughes (1976), 170 Mont. 267, 272, 552 P.2d 328, 331. On the other hand, this Court has warned that excerpted

11

portions of these transcripts can often be used to support almost any position.  Keller v. Smith (1976), 170 Mont. 399, 408-09, 553 P.2d 1002, 1008.  That appears to be the case here.

A comprehensive reading of the Constitutional Convention transcripts indicate that the delegates supported judicial selection both by election and by appointment.  The Judicial Committee presented the delegates with two radically different proposals.  The majority proposal provided for the selection of justices and judges primarily through general elections prior to the end of each judicial term.  Mid-term vacancies were to be filled by appointment by the governor and were effective only until the successor was elected and qualified.  1 Mont. Legislative Council and Constitutional Convention Editing and Publishing Comm., Montana Constitutional Convention 1971-1972, at 506, (1979) [hereinafter Convention].  The delegates were informed that the election system had one major advantage:

> Under a democratic form of government, the people must be given a direct voice in selecting of all important officials, including those of the judicial branch.  Popular elections at periodic intervals prevent the judiciary from imposing political, social and economic policies which are contrary to the fundamental aims of the people.

Mont. Constitutional Convention Comm'n., Mont. Constitutional Convention Study No. 14: The Judiciary, at 137 [hereinafter The Judiciary].

The minority proposal provided for the selection of justices and judges through a system of appointment.  The Judicial Nominating Committee would review the records of candidates and

present the governor with a list of the most qualified nominees. From this list, the governor would select a nominee to be confirmed or rejected by the Senate. A confirmed appointee could face a contested election in the first primary following Senate approval. Thereafter, the appointee would run in an approval-or-rejection contest in a general election for each succeeding term. 1 Convention, supra, at 519. The delegates were informed that the appointment method of systematically screening judicial candidates "is more conducive to attaining a qualified, capable judiciary than the elective method whereby candidates are chosen more for political appeal than merit." The Judiciary, supra, at 141.

The delegates voted to adopt the minority, appointment proposal, 4 Convention, supra, at 1034-35, and then, in a series of debates and amendments before the committee of the whole, broadened its election provisions, 4 Convention, supra, at 1084-1114. The delegates specifically rejected elections as the primary method of judicial selection, 4 Convention, supra, at 1097-99, but voted overwhelmingly to extend the contested election provision beyond the first election after Senate confirmation to all other elections an incumbent would face, 4 Convention, supra, at 1102-03.

The result is a selection system which gives recognition to both appointment and election. It was explained to the delegates that, as amended, the minority proposal provided for the selection of justices and judges through both methods. 4 Convention, supra, at 1112. The delegates were also informed that most of the justices and judges who attained their positions under the 1889

13

Constitution had been appointed by the executive. Just prior to the Constitutional Convention, four of the five serving Supreme Court Justices, and at least twenty-one of the twenty-eight serving District Court Judges, had originally been appointed. The Judiciary, supra, at 136. The current makeup of the judiciary reflects the delegates' recognition of both appointment and election. Eighteen of the thirty-six currently serving District Court Judges and three of the seven currently serving Supreme Court Justices began their offices as appointees. Furthermore, twenty-eight states and the District of Columbia select their supreme court justices through some type of appointment. Another ten of the twenty-two states relying on partisan and nonpartisan elections, use appointments to fill supreme court vacancies.

We cannot agree with the assertion that the framers' intent and public policy overwhelmingly support judicial election over appointment, and, therefore, that elections should be imposed when the Constitution does not explicitly exclude them. The Constitutional Convention delegates extensively discussed and apparently fully understood the advantages of each system. Judicial elections fulfill a democratic society's expectation that its citizens will retain some degree of control over judicial officials and will have a remedy available when judicial decisions depart from that society's political, economic, and social norms. The appointment system, on the other hand, is intended to ensure that the most qualified and capable judicial candidates reach office. In adopting Art. VII, Sec. 8, Mont. Const., the delegates recognized and adopted two valid methods of judicial selection.

14

## E.

## Art. VII, Sec. 8(2) Mont. Const.

What interpretation is to be placed on the requirement of subsection (2) as to the election before each succeeding term of office? Is this provision to be limited to an appointee or does it also cover an elected justice or judge?

In Keller v. Smith we held that the second sentence of subsection (2) required every unopposed, incumbent, Supreme Court Justice or District Court Judge to run on an approval or rejection ballot in the next general election prior to the expiration of the term, irrespective of whether he or she attained office through appointment or election. Keller, 170 Mont. at 408, 553 P.2d at 1008. The Court also stated in dicta that the word "incumbent" in the first sentence of subsection (2) refers only to appointees. Keller, 170 Mont. at 406, 553 P.2d at 1006-07. The Attorney General relies on that statement in support of his position that the first sentence of subsection (2) only mandates election for confirmed appointees.

We have examined subsection (2) and subsection (3) and considered the use of the word "incumbent" in the five different places contained in those subsections. Our examination of the Constitutional Convention records does not indicate that the delegates intended different meanings for the same word in two succeeding sentences. If we held that the first sentence applied only to appointed judges when it used the term incumbent, that would contradict Keller's conclusion that "incumbent" in the second sentence referred to both appointed and elected judges. Both

15

sentences are clearly meant to be read together. The first sentence of subsection (2) provides for contested elections when a candidate files against an incumbent. The second sentence provides for approval-or-rejection election when no candidate files against the incumbent. We conclude that the first sentence of subsection (2) refers to both appointed incumbents and elected incumbents, in a manner similar to the second sentence of subsection (2) as interpreted in Keller. However, that conclusion is not decisive of the issue before us.

## III.

The language of Art. VII, Sec. 8(1), Mont. Const. contains the key to the ambiguity in Art. VII, Sec. 8(2), Mont. Const. The holding of Jones v. Judge is controlling. In Jones the governor had appointed Justice Haswell to the Chief Justice position when the Senate was out of session and therefore had no opportunity to confirm the appointment before the next general election. In Jones this Court relied on the clear and unambiguous command of subsection (1) in holding that the Constitution does not require a nominee to stand for election until after the Senate confirmation. Jones (1978), 176 Mont. 251, 254-55, 577 P.2d 846, 848.

Jones differs from the present case only in that the present judicial terms will expire before the Senate would have an opportunity to consider confirmation in 1991. That difference is not significant. Justice Barz took office on September 11, 1989, with the first general election after confirmation scheduled for November of 1992, see § 13-1-104(1), MCA, a period of thirty-eight

16

months. Chief Justice Haswell took office on March 10, 1978, with the first general election after confirmation in November of 1980, see § 23-2604, RCM (1947), a period of thirty-two months. The actual time served by these two appointees prior to facing election would be substantially the same.

As in Jones, we must resolve the present ambiguity by construing the Constitution as a whole with each provision bearing upon the same subject matter receiving appropriate attention. Jones, 176 Mont. at 255-56, 577 P.2d at 849.

We restate the relevant sentence of subsection (1) of Art. VII, Sec. 8, Mont. Const.:

> Each nomination shall be confirmed by the senate, but a nomination made while the senate is not in session shall be effective as an appointment until the end of the next session.

In Jones the petitioners argued that the above quoted portion of subsection (1) was ambiguous. This Court disagreed stating:

> There is nothing ambiguous about this language. When the words of a statute are plain, unambiguous, direct and certain, it speaks for itself and there is nothing for the court to construe.
>
> . . .
>
> The language of the Constitution is unequivocally clear so that when a judicial vacancy exists, <u>a nomination made when the senate is not in session is effective as an appointment until the end of the next session</u>. The holding in <u>Keller v. Smith</u>, supra, that the word "incumbent" in Article VII, Section 8 is ambiguous has no bearing on the clarity of any other language in this section. . . .
>
> <u>Because the language is unambiguous there is nothing for the Court to construe</u>.

17

<u>Jones</u>, 176 Mont. at 254-55, 577 P.2d at 848 (Emphasis added, citation deleted).

We therefore must balance our interpretation of these two sentences in subsections (1) and (2). Under subsection (1), we have the <u>Jones</u> holding that the nominations here in question "shall be effective as appointments until the end of the next session of the Legislature." For consideration we have the ambiguous sentence in subsection (2) which indicates the possibility that a 1990 election may be required. In balancing these provision, we conclude that, consistent with our holdings in <u>Keller v. Smith</u> and <u>Jones v. Judge</u>, the unambiguous provision contained in subsection (1) controls so that a judicial nominee need not stand for election until the next election after the Senate's confirmation of the nominee. We hold that under the facts of this case, the Secretary of State is not required to place Montana Supreme Court Justice Position Number One, Thirteenth Judicial District Department 4, and Eighteenth Judicial District Department 2, on the 1990 ballot.

In reaching this holding, we have considered the language of subsection (1) and subsection (2) as well as the delegates' intention with reference to appointees and nonappointees. In substance we conclude that the general constitutional rule is that appointees and nonappointees shall stand for contested and uncontested elections at the general elections prior to the expiration of each judicial term. The exception to that general rule provides that when the Senate has not had an opportunity to confirm a nominee, the nominee must stand for election for the first time at the next election following Senate confirmation.

18

We have been presented with extensive arguments as to the potential for unreasonable results and even abuses of the judicial selection system. We limit our decision to the facts and issues of the case before us.

The hazards pointed out by the parties do suggest that it would be wise for the Legislature to consider amendment of the Constitution. The clarity of the process by which justices and judges are selected in Montana is of fundamental concern. The Legislature and the citizens of Montana have the power to amend the Constitution and to eliminate the ambiguities and hazards present at this time.

The writ of mandamus issued by the District Court in Huntley v. Cooney, No. ADV-90-187, dated March 10, 1990, is vacated.

_____
Justice

We Concur:


_____
Chief Justice

_____
Justice

District Judge Leonard Langen
sitting for Justice Barz

_____
District Judge Peter L. Rapkoch
sitting for Justice McDonough

19

Chief Justice J. A. Turnage, specially concurring:

I concur in the majority opinion.

I believe that the analysis concerning ambiguity in Art. VII, Sec. 8(2), Mont. Const., is correct under the existing precedents cited in the majority opinion; however, it would not have been necessary to discuss this question.

There is no need to balance the interpretations of Art. VII, Sec. 8(1), and Art. VII, Sec. 8(2). The plain and unambiguous language of Art. VII, Sec. 8(1), "[e]ach nomination shall be confirmed by the senate, but a nomination made while the senate is not in session shall be effective as an appointment until the end of the next session" requires no interpretation or balancing. (Emphasis supplied.)

This Court applies the rules of statutory construction when interpreting the Constitution. Under those rules, the intent of the framers is controlling and that intent must first be determined from the plain language of the words used. Butte-Silver Bow Local Govern. v. State (Mont. 1989), 768 P.2d 327, 330, 46 St.Rep. 87, 90.

The emphasized language of Art. VII, Sec. 8(1), is plain and unambiguous. The words are clear and need no interpretation.

_____
Chief Justice

20