
DA 12-0187

IN THE SUPREME COURT OF THE STATE OF MONTANA

2012 MT 111

ARLYNE REICHERT, WADE DAHOOD,
JEAN BOWMAN, PATRICIA ROSENLEAF,
SUSAN LUBBERS, JOAN HURDLE, ROBERT
FILIPOVICH, KAREN RICHARDSON, DALE
McGARVEY, JUDY MATHRE, MILLY
GUTKOWSKI, GLADYS HARDIN, LOUISE
DAVIS, and MERLIN DAVIS,

        Plaintiffs and Appellees,

   vs.

STATE OF MONTANA, by and through
LINDA McCULLOCH, in her capacity
as Secretary of State,

        Defendant and Appellant.

APPEAL FROM:    District Court of the First Judicial District,
In and For the County of Lewis and Clark, Cause No. DDV-2011-1086
Honorable James P. Reynolds, Presiding Judge

COUNSEL OF RECORD:

        For Appellant:

                Steve Bullock, Montana Attorney General, Andrew I. Huff,
Assistant Attorney General, Helena, Montana

        For Appellees:

                Lawrence A. Anderson, Attorney at Law, Great Falls, Montana

                Peter Michael Meloy, Meloy Law Firm, Helena, Montana

        For Amici Curiae Seven Montana Legislators:

                Arthur V. Wittich, Margaret M. Reader, Wittich Law Firm, P.C.,
Bozeman, Montana

Submitted on Briefs:  April 12, 2012

Decided:  May 18, 2012

Filed:

_____
Clerk

Justice James C. Nelson delivered the Opinion of the Court.

¶1 The State of Montana appeals from the decision of the First Judicial District Court, Lewis and Clark County, ordering Secretary of State Linda McCulloch to decertify Legislative Referendum No. 119 (LR-119) and enjoining the Secretary of State from presenting LR-119 on the June 5, 2012 primary election ballot.

¶2 We address the following issues on appeal:

1. Whether the non-retiring justices on this Court should recuse themselves from participating in the decision of this appeal.

2. Whether Plaintiffs' constitutional challenge to LR-119 is justiciable.

3. Whether LR-119 is constitutionally defective.

4. Whether the constitutionally infirm provisions of LR-119 can be severed from the remainder of the referendum.

¶3 We hold that recusal is not required. We further hold that Plaintiffs' complaint is justiciable, that LR-119 impermissibly amends the Montana Constitution, and that the offending provisions cannot be severed. We accordingly affirm the District Court.

## BACKGROUND

### LR-119

¶4 The 62nd Montana Legislature enacted Senate Bill 268 (SB 268), which submits to the electorate the question whether certain statutory changes should be made regarding the election of justices to the Montana Supreme Court. *See* Laws of Montana, 2011, ch. 203. SB 268 was filed with the Secretary of State on April 18, 2011, and was to be submitted to the voters at a special election to be held concurrently with the June 5, 2012 primary election. SB 268 was to appear on the ballot as Legislative Referendum No. 119.

The ballot language of LR-119 and the text of SB 268 are included as an appendix following this Opinion.

¶5 The Montana Supreme Court is composed of seven justices, one of whom is chief justice. Mont. Const. art. VII, § 3(1); § 3-2-101, MCA. The justices serve eight-year terms, which run from the first Monday of January following the justice's election to (but not including) the first Monday of January eight years hence. Mont. Const. art. VII, 7(2); §§ 3-2-101, -103, MCA. One or two of the seats come up for election every two years.[1] To be eligible to the office of Supreme Court justice, the person must (1) be a citizen of the United States, (2) have resided in Montana for two years immediately before taking office, and (3) have been admitted to the practice of law in Montana for at least five years prior to the date of appointment or election. Mont. Const. art. VII, § 9(1). Supreme Court justices must reside within the state. Mont. Const. art. VII, § 9(4).

¶6 Under current law, the justices are elected on a statewide basis. *See* § 3-2-101, MCA. LR-119 would change the law so that each justice is elected from one of seven districts of approximately equal population. The districts created under LR-119 follow county lines—for example, the Fifth Supreme Court district would consist of Lincoln, Sanders, Flathead, Glacier, and Toole Counties. The district numbers correspond to the justices' current seat numbers, with Chief Justice McGrath's seat being assigned to the seventh district (Missoula, Lake, and Mineral Counties). The justices would be required

---

[1] Seats 5 and 6 (presently held by Justices Nelson and Morris, respectively) are up for election this coming November. Seats 1 and 2 (Justices Rice and Wheat) come up for election in 2014, Seat 3 (Justice Cotter) and the Chief Justice (McGrath) in 2016, and Seat 4 (Justice Baker) in 2018.

to reside and be registered to vote in their respective districts at the time they are elected, and electors in a given district could vote only for that district's justice. Consequently, rather than voting for each of the seven Supreme Court justices as they come up for election in two-year intervals, electors could vote for only one of the justices, who would come up for election every eight years. The chief justice would then be chosen from among the seven justices by majority vote of the justices.

¶7 LR-119, therefore, would effect three changes concerning the qualifications and selection of justices. First, LR-119 adds a residency and voter-registration requirement: a candidate for a seat on the Supreme Court must be a "qualified elector" of the district from which the candidate is elected. (Once elected, a justice is not required to reside within that district during the justice's service in office.) Second, LR-119 creates seven Supreme Court districts and requires that each justice be elected from a separate district. Only voters in a given district are eligible to vote for that district's justice. Third, LR-119 changes the method of selecting the chief justice from a statewide election to a selection by the seven justices from among their number.

**Procedural History**

¶8 Plaintiffs[2] are Montana citizens, taxpayers, and electors who historically have participated in elections for justices of the Montana Supreme Court and who reside in each of the seven districts proposed by LR-119. Plaintiffs commenced this action on

---

[2] Arlyne Reichert, Wade Dahood, Jean Bowman, Patricia Rosenleaf, Susan Lubbers, Joan Hurdle, Robert Filipovich, Karen Richardson, Dale McGarvey, Judy Mathre, Milly Gutkowski, Gladys Hardin, Louise Davis, and Merlin Davis. Reichert, Dahood, and Bowman were delegates to the 1972 Montana Constitutional Convention. Hurdle is a former Montana legislator.

November 23, 2011, naming the State, by and through Secretary of State Linda McCulloch, as defendant. Plaintiffs sought a declaratory judgment that LR-119 is constitutionally defective. Plaintiffs asked the District Court to order the State to decertify LR-119 and to enjoin the State from placing LR-119 on the ballot. The State, through the Attorney General, filed an answer on January 3, 2012. The answer included responses to the specific allegations of the complaint. In addition, the State asserted that Plaintiffs' constitutional challenge is not ripe and that LR-119 is not constitutionally defective in any event. Plaintiffs filed a motion for summary judgment, together with a supporting brief and affidavits, on January 18. The State filed its brief in opposition on February 10, and Plaintiffs filed their reply on February 23. The District Court scheduled a summary judgment hearing for March 14.

¶9 Meanwhile, on January 9, seven individual Montana legislators[3] (Legislators) filed a motion to intervene in the action as party defendants pursuant to M. R. Civ. P. 24. The Attorney General opposed the motion but stated that he would consent to an amicus brief from Legislators. Plaintiffs did not state a position on the matter. The District Court issued an order on February 28 denying intervention. The court indicated that Legislators could instead provide input regarding the issues in the case as amici curiae.

¶10 In response to the District Court's ruling, Legislators first filed a direct appeal to this Court on March 9. Plaintiffs responded with a motion to dismiss the appeal and a

---

[3] One of the legislators is identified as the primary sponsor of SB 268 (Senator Joe Balyeat). The other six legislators (Representatives Mark Blasdel, Ryan Osmundson, Mathew Rosendale, and Kelly Flynn, and Senators Edward Walker and Greg Hinkle) supported SB 268 and voted for its passage. The legislators reside in each of the seven districts proposed by LR-119.

6

motion to expedite ruling. Plaintiffs explained that the Secretary of State had to certify the June 5 primary election ballot by March 22 and that, in light of certain statutory deadlines, Plaintiffs' challenge to LR-119 would be difficult to resolve on time if the summary judgment hearing were not permitted to go forward, as scheduled, on March 14. After receiving responses from Legislators and the Attorney General, this Court granted Plaintiffs' motion to dismiss. *Reichert v. State*, No. DA 12-0156 (Mar. 13, 2012). The District Court held the hearing on Plaintiffs' motion for summary judgment on March 14, at which time counsel for Plaintiffs and counsel for the State gave oral argument. Counsel for Legislators was present via telephone. The court indicated that it would issue a ruling by March 20.

¶11 In the interim, Legislators filed a petition for writ of supervisory control on March 15, again challenging the District Court's denial of their motion to intervene. This Court denied the petition and affirmed the District Court's February 28 order. *Seven Mont. Legislators v. First Jud. Dist. Ct.*, No. OP 12-0171 (Mar. 16, 2012). We noted that if they wished to do so, Legislators could participate in the action by filing an amicus brief in the District Court electronically by 9:00 a.m. on March 19. Legislators did not file an amicus brief on March 19; however, per an earlier request by Legislators (filed March 15), the District Court did consider Legislators' previously filed documents (their answer to the complaint, and their response brief in opposition to Plaintiffs' motion for summary judgment) in analyzing the issues.

¶12 The District Court rendered its decision on March 20, granting summary judgment to Plaintiffs. The court determined, and the parties do not dispute, that the issues in this

case are issues of law. In summary, the court concluded: that Plaintiffs' challenge to LR-119 is justiciable; that LR-119 is unconstitutional on its face because it attempts, through statutory measures, to change the constitutionally established qualifications for Supreme Court justice by adding a new residency requirement; that LR-119's division of the state into seven Supreme Court districts, with the requirement that one justice be selected from each district, also introduces an unconstitutional residency requirement; and that LR-119 cannot be salvaged by severing the invalid portions of the referendum. The District Court's reasoning is discussed below where applicable. As noted, the court ordered the Secretary of State to decertify LR-119 and enjoined the Secretary of State from presenting LR-119 on the June 5, 2012 ballot.

### Post-Decision Events

¶13 The State filed its notice of appeal with the Clerk of this Court on March 21. Also on March 21, the State filed with the Clerk of the District Court a motion pursuant to M. R. Civ. P. 62(c) and M. R. App. P. 22(1)(a)(i) for an immediate stay of the District Court's March 20 order. The State argued that under § 13-27-501, MCA, the Secretary of State had to certify LR-119 for the June 5 ballot by 5:00 p.m. on March 22. If certification did not take place (per the District Court's order), then the preparation of the voter information pamphlets concerning this issue would cease and the ballots would be prepared without LR-119. The State proposed that if the District Court stayed its order, the Secretary of State could certify LR-119 and move forward with the voter information pamphlets and ballots. In the event this Court ultimately reversed the District Court's order, then the pamphlets and ballots would already be prepared. Conversely, if this

8

Court affirmed the District Court's order, then we could order that the votes on LR-119 should not be counted and have no force or effect, as occurred in *Montanans for Justice v. State*, 2006 MT 277, ¶ 87, 334 Mont. 237, 146 P.3d 759. If, however, the Secretary of State did not certify LR-119, and if this Court ultimately reversed the District Court's order, then it might not be possible to prepare voter information pamphlets and ballots for LR-119 in time for the June 5 election.

¶14 Notwithstanding its request for an "immediate" stay, the State did not present the District Court with a proposed order or include a separate notice that the matter had to be ruled upon before 5:00 p.m. the next day. Nor did the State request that the Clerk of the District Court bring the motion to the court's attention within a certain timeframe. One had to read the State's brief to glean this information; however, as explained by the Clerk of the District Court, she and her staff do not have the time to read and interpret all of the documents filed with the court. As a result, the State's motion was not presented to the District Court judge until approximately 1:30 p.m. on March 23. By this time, pursuant to §§ 13-10-208 and -209, MCA, the Secretary of State had already certified to local election administrators the candidates and ballot issues that are to appear on the June 5 ballot. In compliance with the District Court's March 20 order, the Secretary of State did not certify LR-119 for the ballot. Thus, because it was too late to issue an effective order staying its March 20 order, the District Court denied the State's motion on March 23.

¶15 On April 4, the State filed a motion in this Court to expedite the briefing and disposition of this appeal. The State explained that under § 13-21-210(5), MCA, and the Uniformed and Overseas Citizens Absentee Voting Act (42 U.S.C. §§ 1973ff et seq.),

9

absentee ballots must be provided to oversees and absentee electors not later than 45 days before a federal primary election. Thus, should this Court reverse the District Court's March 20 order, a supplemental ballot would have to be prepared and ready for mailing by April 20 in order to comply with state and federal deadlines. The State asserted that the April 20 deadline could be met if this Court rendered its decision by April 13, but if an expedited disposition were not granted, then this appeal would effectively be moot. The State opined that the voter information pamphlets could follow in a later mailing, provided that this Court allowed for mailing of the pamphlets on a timeline different from the statutory deadline. The State provided no authority for this Court to do so, however. Finally, the State noted that it was prepared to submit its opening brief by April 6.

¶16 This Court granted the State's motion on April 5. We ordered the State to file its brief by April 6, Plaintiffs to file their brief by April 10, and Legislators to file their amicus brief (if they wished to file one) by April 10.[4] With the briefing completed, this Court issued an order on April 12 affirming the District Court's March 20 decision. We stated that our opinion, analysis, and rationale would follow in due course. The analysis and rationale for our April 12 order are now provided herein.

## STANDARDS OF REVIEW

¶17 Several standards of review are implicated in our resolution of this appeal.

_____

[4] Although not parties to this litigation, Legislators nevertheless filed a notice of appeal on March 23, purporting to appeal from the District Court's February 28 order denying their motion to intervene and from the District Court's March 20 order granting Plaintiffs' motion for summary judgment. In our April 5 order, we struck Legislators' notice of appeal, noting that we had already affirmed the District Court's February 28 order in *Seven Mont. Legislators v. First Jud. Dist. Ct.*, No. OP 12-0171 (Mar. 16, 2012). We invited Legislators instead to file an amicus brief.

10

¶18 First, we review a district court's rulings on summary judgment de novo, applying the same criteria as did the district court under M. R. Civ. P. 56. *Krajacich v. Great Falls Clinic, LLP*, 2012 MT 82, ¶ 8, 364 Mont. 455, ___ P.3d ___; *PPL Mont., LLC v. State*, 2010 MT 64, ¶ 85, 355 Mont. 402, 229 P.3d 421, *reversed on other grounds*, ___ U.S. ___, 132 S. Ct. 1215 (2012). Summary judgment is appropriate when the moving party demonstrates both the absence of any genuine issues of material fact and entitlement to judgment as a matter of law. *Styren Farms, Inc. v. Roos*, 2011 MT 299, ¶ 10, 363 Mont. 41, 265 P.3d 1230; *Williams v. Plum Creek Timber Co.*, 2011 MT 271, ¶¶ 13-14, 362 Mont. 368, 264 P.3d 1090.

¶19 Second, the District Court's decision involved the interpretation of constitutional and statutory language—albeit, with respect to the latter, *proposed* statutory language submitted by the Legislature to the electorate in a referendum. The interpretation and construction of constitutional and statutory provisions is a matter of law which we review de novo, determining whether the court's interpretation and construction are correct. *See Mont. Shooting Sports Assn. v. State*, 2010 MT 8, ¶ 12, 355 Mont. 49, 224 P.3d 1240; *State v. Brown*, 2009 MT 452, ¶ 6, 354 Mont. 329, 223 P.3d 874; *State v. Mizenko*, 2006 MT 11, ¶ 8, 330 Mont. 299, 127 P.3d 458; *cf. City of Billings v. Albert*, 2009 MT 63, ¶ 11, 349 Mont. 400, 203 P.3d 828 (the constitutionality of a statute is a question of law, for which our review is plenary).

¶20 Third, issues of justiciability—such as standing, mootness, ripeness, and political question—are also questions of law, for which our review is de novo. *See Northfield Ins. Co. v. Mont. Assn. of Counties*, 2000 MT 256, ¶ 8, 301 Mont. 472, 10 P.3d 813 ("A

district court's ruling on whether a justiciable controversy exists is a conclusion of law."); *Columbia Falls Elementary Sch. Dist. No. 6 v. State*, 2005 MT 69, ¶ 12, 326 Mont. 304, 109 P.3d 257 ("Whether an issue presents a non-justiciable political question is a legal conclusion that this Court reviews de novo."); *Mont. State Fund v. Simms*, 2012 MT 22, ¶ 14, 364 Mont. 14, 270 P.3d 64 ("A district court's determination regarding standing presents a question of law which we review de novo for correctness."); *Smith v. T-Mobile USA Inc.*, 570 F.3d 1119, 1122 (9th Cir. 2009) ("We review de novo whether a case is moot and whether plaintiffs have standing."); *Verizon Cal. Inc. v. Peevey*, 413 F.3d 1069, 1072 (9th Cir. 2005) ("We review de novo whether claims are ripe for judicial review.").

¶21 Lastly, we review for manifest abuse of discretion the granting of a preliminary or permanent injunction. *Shammel v. Canyon Resources Corp.*, 2003 MT 372, ¶ 12, 319 Mont. 132, 82 P.3d 912. A manifest abuse of discretion is one that is obvious, evident, or unmistakable. *Shammel*, ¶ 12. However, where the issuance of an injunction is based upon conclusions of law, we review those conclusions to determine if they are correct. *St. James Healthcare v. Cole*, 2008 MT 44, ¶ 21, 341 Mont. 368, 178 P.3d 696.

## DISCUSSION

¶22 Before we may address the substantive merits of whether LR-119 is invalid, there are two threshold issues which must be considered and resolved. First, Legislators have raised the question whether certain justices of this Court should recuse themselves from this case. This question is obviously antecedent to all other issues on appeal, and we thus address it first (commencing at ¶ 23). Second, the State has raised the question whether Plaintiffs' challenge to LR-119 is justiciable. The judicial power of Montana's courts is

limited to justiciable controversies—meaning that our courts do not resolve abstract differences of opinion or advise what the law would be upon a hypothetical state of facts. *Plan Helena, Inc. v. Helena Regl. Airport Auth. Bd.*, 2010 MT 26, ¶¶ 6, 9, 355 Mont. 142, 226 P.3d 567. Hence, issues of justiciability—such as whether the plaintiff has standing and whether the dispute is ripe or moot—are antecedent, as well, to any discussion of the substantive merits of the parties' claims. *Plan Helena*, ¶ 11; *Heffernan v. Missoula City Council*, 2011 MT 91, ¶ 29, 360 Mont. 207, 255 P.3d 80; *Havre Daily News, LLC v. City of Havre*, 2006 MT 215, ¶¶ 18, 31, 333 Mont. 331, 142 P.3d 864. We therefore address the justiciability question after the recusal question (commencing at ¶ 52). Then, having resolved the recusal question, and having concluded that this case is justiciable, we reach the merits of Plaintiffs' challenge to LR-119 under Issue 3 (commencing at ¶ 61).

¶23 ***Issue 1.  Whether the non-retiring justices should recuse themselves.***

¶24 Legislators argue in their amicus brief that all non-retiring justices of this Court should recuse themselves. Chief Justice McGrath and Justice Morris recused themselves at the outset of this appeal. The Honorable Thomas McKittrick of the Eighth Judicial District Court is sitting for Chief Justice McGrath, and the Honorable Karen Townsend of the Fourth Judicial District Court is sitting for Justice Morris. *See* Mont. Const. art. VII, § 3(2) ("A district judge shall be substituted for the chief justice or a justice in the event of disqualification or disability . . . ."). Justice Nelson is presently serving the final year of his eight-year term and is not seeking reelection. He is Acting Chief Justice in this case pursuant to § 3-2-301, MCA. Thus, Legislators expressly direct their arguments to Justices Rice, Wheat, Cotter, and Baker. Citing the Due Process Clause and the Montana

13

Code of Judicial Conduct, Legislators contend that these four justices have a duty to disqualify themselves because they have an "interest" in the outcome of the case.

¶25 As an initial matter, it is important to acknowledge that neither Plaintiffs nor the Attorney General has argued that—or even raised the question whether—Justices Rice, Wheat, Cotter, and Baker ought to recuse themselves from this case. That issue is raised solely by Legislators. This Court has long held, however, that amici curiae cannot raise separate issues not raised by the parties. *See State ex rel. Bennett v. Bonner*, 123 Mont. 414, 421, 214 P.2d 747, 751 (1950); *State ex rel. Dept. of Health & Envtl. Sci. v. Lasorte*, 182 Mont. 267, 275-76, 596 P.2d 477, 482 (1979); *Flynn v. Mont. State Fund*, 2011 MT 300, ¶ 22, 363 Mont. 55, 267 P.3d 23. One reason for this rule is that "[t]he theories and arguments in the case should not be changed by amici at the expense of the litigants by injecting new and extraneous issues in the case." *Crabtree v. Mont. State Lib.*, 204 Mont. 398, 409, 665 P.2d 231, 237 (1983) (Haswell, C.J., specially concurring). Moreover, there is "[t]he everpresent danger that issues and arguments . . . not considered significant or controlling by the litigants themselves will not be adequately briefed or argued on appeal." *Crabtree*, 204 Mont. at 410, 665 P.2d at 237 (Haswell, C.J., specially concurring). It also bears repeating that the right to be heard as amici curiae is within the discretion of the court. *Bennett*, 123 Mont. at 420-21, 214 P.2d at 751. An amicus curiae—meaning "friend of the court"—is "[a] person who is not a party to a lawsuit but who petitions the court or is requested by the court to file a brief in the action because that person has a strong interest in the subject matter." *Black's Law Dictionary* 98 (Bryan A. Garner ed., 9th ed., Thomson Reuters 2009); *see also* M. R. App. P. 2(2)

14

("Amicus curiae. One who is not a party, but who, upon invitation or leave of the supreme court granted on motion, files a brief in a pending proceeding because of a strong interest in the subject matter."). An amicus curiae, "whether attorney or layman, . . . [may] inform the court as to facts or situations that may have escaped consideration or remind the court of legal matter which has escaped its notice and regarding which it appears to be in danger of going wrong." *Bennett*, 123 Mont. at 420, 214 P.2d at 751. But an amicus curiae has no control over the proceedings; he must take the case as he finds it, and it is within the discretion of the court as to whether it will accept the advice or suggestions of an amicus curiae. *Bennett*, 123 Mont. at 421, 214 P.2d at 751.

¶26 The general rule, therefore, is that "[s]ince amici curiae are not parties and cannot assume the functions of parties, nor create, extend or enlarge issues, we . . . consider[ ] the briefs of amici only insofar as they coincide with the issues raised by the parties to the action." *Mont. Wildlife Fedn. v. Sager*, 190 Mont. 247, 265, 620 P.2d 1189, 1200 (1980); *accord Mont. Power Co. v. Carey*, 216 Mont. 275, 277-78, 700 P.2d 989, 990-91 (1985); *Carter v. Miss. Farm Bureau Cas. Ins. Co.*, 2005 MT 74, ¶ 16, 326 Mont. 350, 109 P.3d 735. We have deviated from this rule only in rare instances. *See e.g. Crabtree*, 204 Mont. at 404, 665 P.2d at 234-35 ("While it is not our custom to address separately issues not raised by the parties, we depart from that practice here because of the widespread impact that the Library and amicus argue our opinion will have on the hiring practices within state and local levels of government."); *Schwinden v. Burlington N., Inc.*, 213 Mont. 382, 389-90, 397-98, 691 P.2d 1351, 1355, 1358-59 (1984) (addressing an issue raised by amicus—namely, whether to overrule a decision we had issued two years

15

earlier—because the prior decision had created an "emergency" for the counties due to the resulting reduction in their tax revenue, and the prior decision was still "the centerpiece of the problem" faced by the Court in *Schwinden*); *State Compen. Ins. Fund v. Sky Country, Inc.*, 239 Mont. 376, 378-79, 780 P.2d 1135, 1136-37 (1989) (declining to address the parties' constitutional arguments in light of an antecedent and potentially dispositive statutory question raised by amicus).

¶27    In the present case, while we reaffirm the general rule stated above, we conclude that the importance of the recusal issues raised by Legislators makes this one of the rare instances in which we should consider a question raised by amici but not by the parties themselves. Because the analysis under the Due Process Clause provides useful context for the analysis under the Montana Code of Judicial Conduct, we shall first address Legislators' arguments premised on constitutional standards, and then their arguments premised on the ethical standards set forth in the Code.

### Constitutional Standards

¶28    Legislators analogize the present case to *Caperton v. A.T. Massey Coal Co.*, 556 U.S. 868, 129 S. Ct. 2252 (2009). In *Caperton*, the Supreme Court held that due process "require[s] recusal when 'the probability of actual bias on the part of the judge or decisionmaker is too high to be constitutionally tolerable.' " 556 U.S. at 872, 129 S. Ct. at 2257 (quoting *Withrow v. Larkin*, 421 U.S. 35, 47, 95 S. Ct. 1456, 1464 (1975)). "The inquiry is an objective one. The Court asks not whether the judge is actually, subjectively biased, but whether the average judge in his position is 'likely' to be neutral, or whether there is an unconstitutional 'potential for bias.' " *Caperton*, 556 U.S. at 881,

16

129 S. Ct. at 2262. Stated another way, "[t]he proper constitutional inquiry is whether sitting on the case . . . would offer a possible temptation to the average . . . judge to . . . lead him not to hold the balance nice, clear and true." *Caperton*, 556 U.S. at 879, 129 S. Ct. at 2261 (second and third ellipses in original, internal quotation marks omitted). Under this objective standard, recusal may be required "whether or not actual bias exists or can be proved." *Caperton*, 556 U.S. at 886, 129 S. Ct. at 2265. The temptation not to hold the balance nice, clear, and true may arise from " 'a direct, personal, substantial, pecuniary interest' " in the outcome of the case, *Caperton*, 556 U.S. at 876, 129 S. Ct. at 2259 (quoting *Tumey v. Ohio*, 273 U.S. 510, 523, 47 S. Ct. 437, 441 (1927)), or from other "interests that tempt adjudicators to disregard neutrality," *Caperton*, 556 U.S. at 878, 129 S. Ct. at 2260. The Due Process Clause does not require the judge to have no interest at all, however. *Caperton*, 556 U.S. at 879, 887-88, 129 S. Ct. at 2261, 2265-66. What degree or kind of interest is sufficient to disqualify a judge from sitting " 'cannot be defined with precision. Circumstances and relationships must be considered.' " *Caperton*, 556 U.S. at 879, 880, 129 S. Ct. at 2261 (quoting *In re Murchison*, 349 U.S. 133, 136, 75 S. Ct. 623, 625 (1955)). The crucial question is "whether, 'under a realistic appraisal of psychological tendencies and human weakness,' the interest 'poses such a risk of actual bias or prejudgment that the practice must be forbidden if the guarantee of due process is to be adequately implemented.' " *Caperton*, 556 U.S. at 883-84, 129 S. Ct. at 2263 (quoting *Withrow*, 421 U.S. at 47, 95 S. Ct. at 1464).

¶29 This Court has not heretofore considered the application of these principles to a claim that a justice (or justices) or a judge (or judges) must be recused from a case in the

interest of due process. As Legislators concede, the foregoing standards "protect *the parties'* basic right to a fair trial in a fair tribunal." *Caperton*, 556 U.S. at 887, 129 S. Ct. at 2266 (emphasis added). Again, Legislators are not "parties" to this action, and neither Plaintiffs nor the Attorney General has expressed fairness concerns here. Nevertheless, as noted, given the peculiar significance of the recusal issue in this case, we shall address the due process question.

¶30 Legislators' argument is that "[s]imilar to the nature of the justices' interest in *Tumey* and *Caperton* . . . the justices here have an interest in the outcome of this case." According to Legislators, the alleged interest of the four not-presently-retiring justices is their "potential" to seek reelection in the future. Legislators note that LR-119 would require the justices to run for reelection from certain geographic districts, rather than statewide, which "could possibly prevent a justice from getting reelected if he or she were unable to garner the required number of votes to win in a particular district." Legislators suggest that the average sitting Supreme Court justice "who has even the potential to run for reelection" would be tempted to decide the validity of LR-119 based on his or her perception of which outcome would give the justice the best chance for reelection. The thrust of Legislators' argument is that the average sitting justice would be biased in favor of a statewide election and, thus, would vote to strike down LR-119.

¶31 Legislators are mistaken in their view that these circumstances rise to the level of *Caperton* and *Tumey*. The Due Process Clause does not mandate recusal simply because LR-119 "could possibly" prevent a justice, who "potentially" may decide in the future to seek reelection, from getting reelected. It is important here to make clear that "not all

questions of judicial qualification . . . involve constitutional validity." *Aetna Life Ins. Co. v. Lavoie*, 475 U.S. 813, 820, 106 S. Ct. 1580, 1584 (1986) (ellipsis in original, brackets and internal quotation marks omitted). In fact, " 'most matters relating to judicial disqualification do not rise to a constitutional level.' " *Caperton*, 556 U.S. at 876, 129 S. Ct. at 2259 (brackets omitted) (quoting *FTC v. Cement Institute*, 333 U.S. 683, 702, 68 S. Ct. 793, 804 (1948)). In this regard, the traditional common-law rule, which the Due Process Clause incorporated, required recusal when the judge had a direct, personal, substantial, pecuniary interest in a case, but did not permit disqualification for bias or prejudice. *Caperton*, 556 U.S. at 876-77, 129 S. Ct. at 2259; *Lavoie*, 475 U.S. at 820, 106 S. Ct. at 1584; *State ex rel. Mueller v. Tenth Jud. Dist. Ct.*, 87 Mont. 108, 114, 285 P. 928, 930 (1930). "As Blackstone put it, 'the law will not suppose a possibility of bias or favour in a judge, who is already sworn to administer impartial justice, and whose authority greatly depends upon that presumption and idea.' " *Lavoie*, 475 U.S. at 820, 106 S. Ct. at 1584-85 (citing 3 W. Blackstone, Commentaries *361). Instead, matters of kinship, personal bias, state policy, remoteness of interest, and prejudice were left to statutes and judicial codes. *Caperton*, 556 U.S. at 876-77, 129 S. Ct. at 2259; *Lavoie*, 475 U.S. at 820, 106 S. Ct. at 1584-85. In Montana, such matters are addressed and governed by the 2008 Montana Code of Judicial Conduct. And "[b]ecause the codes of judicial conduct provide more protection than due process requires, most disputes over disqualification will be resolved without resort to the Constitution. Application of the constitutional standard . . . will thus be confined to rare instances." *Caperton*, 556 U.S. at 890, 129 S. Ct. at 2267.

¶32    Indeed, each of the Supreme Court's recusal cases dealt with "extreme facts." *Caperton*, 556 U.S. at 887, 129 S. Ct. at 2265. To illustrate this point, we summarize four of those cases. First, in *Caperton*, a West Virginia trial court entered a $50 million jury verdict against A.T. Massey Coal Co. After the verdict but before the appeal, West Virginia held its 2004 judicial elections. Knowing that the Supreme Court of Appeals of West Virginia would consider the company's appeal, Massey's chairman, chief executive officer, and president (Don Blankenship) decided to support Brent Benjamin, an attorney who sought to replace one of the justices on that court. Blankenship contributed some $3 million to unseat the incumbent and replace him with Benjamin. His contributions eclipsed the total amount spent by all other Benjamin supporters and exceeded by 300 percent the amount spent by Benjamin's campaign committee. *Caperton*, 556 U.S. at 872-73, 884, 129 S. Ct. at 2257, 2264. Given that the election was decided by fewer than 50,000 votes (382,036 to 334,301), the Supreme Court concluded that Blankenship's contributions had a significant and disproportionate influence on the electoral outcome. *Caperton*, 556 U.S. at 885, 129 S. Ct. at 2264. Furthermore, when the contributions were made, it was reasonably foreseeable that Massey's pending appeal would be before the newly elected justice. Absent recusal, Justice Benjamin would review a judgment that had cost his biggest donor's company $50 million. Although there was no allegation of a quid pro quo agreement, the fact remained that Blankenship's extraordinary contributions were made at a time when he had a vested stake in the outcome. The Supreme Court thus reasoned that "[j]ust as no man is allowed to be a judge in his own cause, similar fears of bias can arise when—without the consent of the other parties—a man chooses the judge

20

in his own cause. And applying this principle to the judicial election process, there was here a serious, objective risk of actual bias that required Justice Benjamin's recusal." *Caperton*, 556 U.S. at 886, 129 S. Ct. at 2265. This was so because Blankenship's "significant and disproportionate influence," coupled with the "temporal relationship" between the election and Massey's appeal, offered "a possible temptation to the average . . . judge to . . . lead him not to hold the balance nice, clear and true." *Caperton*, 556 U.S. at 886, 129 S. Ct. at 2265 (ellipses in original, internal quotation marks omitted).

¶33    Second, *Tumey* involved a situation where the mayor of a village had the authority to sit as a judge (with no jury) to try those accused of violating Ohio's Prohibition Act. As the Court later noted in *Caperton*, 556 U.S. at 877, 129 S. Ct. at 2260, two potential conflicts were inherent in this structure. First, the mayor received a salary supplement for performing judicial duties, and the funds for that compensation derived from the fines assessed in a case. Since no fines were assessed upon acquittal, the mayor-judge received a salary supplement only if he convicted the defendant. Second, sums from the criminal fines were deposited into the village's general treasury fund for village improvements and repairs. *See Tumey*, 273 U.S. at 520-22, 47 S. Ct. at 440-41. On these facts, the Supreme Court held that the Due Process Clause required disqualification "both because of [the mayor-judge's] direct pecuniary interest in the outcome, and because of his official motive to convict and to graduate the fine to help the financial needs of the village." *Tumey*, 273 U.S. at 535, 47 S. Ct. at 445.

¶34    Third, *Mayberry v. Pa.*, 400 U.S. 455, 91 S. Ct. 499 (1971), arose out of a criminal trial on charges of prison breach and holding hostages in a penal institution. During the

21

course of trial, Mayberry (who represented himself) engaged in "brazen efforts to denounce, insult, and slander the court and to paralyze the trial." *Mayberry*, 400 U.S. at 462, 91 S. Ct. at 503. He did not merely create "awkward and embarrassing scenes"; he leveled "downright insults" against the trial judge and engaged in "tactics taken from street brawls." *Mayberry*, 400 U.S. at 462, 91 S. Ct. at 503-04. Thus, in addition to being sentenced on the underlying charges for which he was convicted, the judge also pronounced Mayberry guilty of multiple instances of criminal contempt. *Mayberry*, 400 U.S. at 455, 91 S. Ct. at 500. On appeal, the question was whether, under the Due Process Clause, a defendant in criminal contempt proceedings should be given a public trial before a judge other than the one reviled by the contemnor. The Supreme Court answered this question in the affirmative. The Court acknowledged that not every attack on a judge disqualifies him from sitting. *Mayberry*, 400 U.S. at 465, 91 S. Ct. at 505. In *Ungar v. Sarafite*, 376 U.S. 575, 84 S. Ct. 841 (1964), for example, the Court ruled that a lawyer's challenge, though "disruptive, recalcitrant and disagreeable commentary," was still not "an insulting attack upon the integrity of the judge carrying such potential for bias as to require disqualification." 376 U.S. at 584, 84 S. Ct. at 847. In *Mayberry*, however, many of the words leveled at the judge were highly personal aspersions, even "fighting words," including "dirty sonofabitch," "dirty tyrannical old dog," "stumbling dog," and "fool." The judge was charged with running a Spanish Inquisition and told to "Go to hell" and "Keep your mouth shut." *Mayberry*, 400 U.S. at 466, 91 S. Ct. at 505. Insults of this kind, the Supreme Court observed, "are apt to strike at the most vulnerable and human qualities of a judge's temperament." *Mayberry*, 400 U.S. at 466, 91 S. Ct. at

22

505 (internal quotation marks omitted). "No one so cruelly slandered is likely to maintain that calm detachment necessary for fair adjudication." *Mayberry*, 400 U.S. at 465, 91 S. Ct. at 505.

¶35    Lastly, in *Lavoie*, a justice of the Alabama Supreme Court (Justice Embry) cast the deciding vote to uphold a punitive damages award against an insurance company for its bad-faith refusal to pay a claim. At the time, Justice Embry was the lead plaintiff in a very similar bad-faith-refusal-to-pay suit pending in Alabama's lower courts. Alabama law in this area was unsettled at the time. Thus, when Justice Embry cast the deciding vote and authored the court's opinion, he did not merely apply well-established law but, in fact, quite possibly made new law. Moreover, he and the other justices in the majority refused to set aside as excessive a punitive damages award of $3.5 million, although the largest punitive award previously affirmed by the court was $100,000. *Lavoie*, 475 U.S. at 822-23, 106 S. Ct. at 1585-86. As a result, Justice Embry's deciding vote in *Lavoie* "undoubtedly 'raised the stakes' " for the insurance company (Blue Cross-Blue Shield of Alabama) in his own suit. *Lavoie*, 475 U.S. at 823-24, 106 S. Ct. at 1586. His opinion for the Alabama Supreme Court "had the clear and immediate effect of enhancing both the legal status and the settlement value of his own case." *Lavoie*, 475 U.S. at 824, 106 S. Ct. at 1586. In this respect, Justice Embry had a "direct, personal, substantial, and pecuniary" interest in the outcome and essentially "acted as a judge in his own case." *Lavoie*, 475 U.S. at 824, 106 S. Ct. at 1586 (brackets and internal quotation marks omitted). The Supreme Court thus held that Justice Embry's participation in *Lavoie* violated the appellant's due process rights. *Lavoie*, 475 U.S. at 825, 106 S. Ct. at 1587.

23

¶36    The appellant in *Lavoie* challenged not only the participation of Justice Embry, but also the participation of the other justices of the Alabama Supreme Court, or at least the six justices who had not withdrawn from Justice Embry's class action against Blue Cross. The appellant claimed that these justices also had "an interest in this case." The Supreme Court concluded, however, that such allegations did not constitute a sufficient basis for requiring recusal under the Constitution. For one thing, "accepting appellant's expansive contentions might require the disqualification of every judge in the State. If so, it is possible that under a 'rule of necessity' none of the judges or justices would be disqualified." *Lavoie*, 475 U.S. at 825, 106 S. Ct. at 1587 (citing *United States v. Will*, 449 U.S. 200, 214, 101 S. Ct. 471, 480 (1980)).[5] More importantly, while these justices "might conceivably have had a slight pecuniary interest," the Court found it "impossible to characterize that interest as direct, personal, substantial, and pecuniary." *Lavoie*, 475 U.S. at 825-26, 106 S. Ct. at 1587-88 (brackets and internal quotation marks omitted). Rather, any interest the justices might have had was "highly speculative and contingent." *Lavoie*, 475 U.S. at 826, 106 S. Ct. at 1588. At the time, the Alabama trial court had not even certified a class, let alone awarded any class relief of a pecuniary nature. At some point, the Supreme Court observed, "the biasing influence . . . will be too remote and

---

[5] Under the rule of necessity, " 'wherever it becomes necessary for a judge to sit even where he has an interest—where no provision is made for calling another in, or where no one else can take his place—it is his duty to hear and decide, however disagreeable it may be.' " *Will*, 449 U.S. at 214, 101 S. Ct. at 480 (quoting *Phila. v. Fox*, 64 Pa. 169, 185 (1870)); *see also State ex rel. Yuhas v. Bd. of Med. Examrs.*, 135 Mont. 381, 388, 339 P.2d 981, 984-85 (1959) ("[T]he rule of disqualification must yield to the demands of necessity in that the only tribunal in which relief could be had may not be disqualified when the result would be to prevent a determination of the proceeding.").

insubstantial to violate the constitutional constraints." *Lavoie*, 475 U.S. at 826, 106 S. Ct. at 1588 (ellipsis in original, brackets and internal quotation marks omitted).

¶37 Returning now to the present case, we first note that the interest identified by Legislators as necessitating recusal is not exclusive to the four not-presently-retiring justices. In the event of a justice's disqualification, "[a] district judge shall be substituted." Mont. Const. art. VII, § 3(2). A district judge, however, also has "the potential" to run for a seat on this Court in the future, "could possibly" be prevented by LR-119 from getting elected, and thus (under Legislators' theory) has an "interest" in the outcome of this case. Under a logical extension of Legislators' argument, no judge in this state—indeed, no otherwise qualified person with "the potential" to run for Supreme Court justice—could sit on this case. Hence, applying the rule of necessity, none of the justices would be disqualified. *Lavoie*, 475 U.S. at 825, 106 S. Ct. at 1587.

¶38 But more importantly, "the potential" to run for reelection in the future, coupled with the fact that LR-119 "could possibly" prevent a justice from getting reelected if he or she were unable to garner the required number of votes to win in a particular district, does not constitute a "direct, personal, substantial, and pecuniary" interest. *Lavoie*, 475 U.S. at 825-26, 106 S. Ct. at 1587-88 (brackets and internal quotation marks omitted). Indeed, any interest the justices might conceivably have in this case is "highly speculative and contingent." *Lavoie*, 475 U.S. at 826, 106 S. Ct. at 1588. It is sheer conjecture at this point whether the adoption of district-based elections under LR-119, in lieu of statewide elections under the current system, would help or hinder a justice's chance for reelection. It is also sheer conjecture whether LR-119 will become law, whether the four

25

justices will seek reelection, and whether anyone will run against them. The Supreme Court has been "careful to distinguish the extreme facts of the cases before it from those interests that would not rise to a constitutional level." *Caperton*, 556 U.S. at 887-88, 129 S. Ct. at 2265-66. The fact that the justices have "the potential" to seek reelection and "could possibly" be hindered in their reelection bids by LR-119 (assuming it passes) does not create the sort of "extreme," "extraordinary," "exceptional," and "rare" circumstances that the Supreme Court has indicated must exist before a due process violation will be found. *Caperton*, 556 U.S. at 884, 887, 890, 129 S. Ct. at 2263, 2265, 2267. This case does not involve the exertion of a "significant and disproportionate influence" by an interested party, coupled with a "temporal relationship" between that exertion of influence and the justices' consideration of the interested party's case, as occurred in *Caperton*, 556 U.S. at 886, 129 S. Ct. at 2265. Likewise, the justices are not "embroiled in a running, bitter controversy" with any of the parties to this case, as occurred in *Mayberry*, 400 U.S. at 465, 91 S. Ct. at 505. And while Legislators suggest that the four justices here, like Justice Embry in *Lavoie* and the mayor-judge in *Tumey*, have a pecuniary interest in the outcome of the case (namely, safeguarding their future employment), the truth of the matter is that the justices' decision as to the validity of LR-119 will not have "the clear and immediate effect" of enhancing their reelection prospects. *Lavoie*, 475 U.S. at 824, 106 S. Ct. at 1586 (Justice Embry's opinion for the court in *Lavoie* had the clear and immediate effect of enhancing both the legal status and the settlement value of his own case); *Tumey*, 273 U.S. at 520-22, 47 S. Ct. at 440-41 (the mayor-judge received a salary supplement, and the village received additional funds for

26

improvements and repairs, only if the mayor-judge convicted the defendants). To the contrary, any biasing influence here is, as it was with the other justices on the Alabama Supreme Court, "too remote and insubstantial to violate the constitutional constraints."[6] *Lavoie*, 475 U.S. at 826, 106 S. Ct. at 1588 (internal quotation marks omitted).

¶39 There is "a presumption of honesty and integrity in those serving as adjudicators." *Withrow*, 421 U.S. at 47, 95 S. Ct. at 1464. "Charges of disqualification should not be made lightly." *Lavoie*, 475 U.S. at 826-27, 106 S. Ct. at 1588. Considering the matter objectively, the interest alleged by Legislators does not "offer a possible temptation to the average . . . judge to . . . lead him [or her] not to hold the balance nice, clear and true." *Caperton*, 556 U.S. at 879, 129 S. Ct. at 2261 (ellipses in original, internal quotation marks omitted). Restated, "under a realistic appraisal of psychological tendencies and human weakness," the interest does not pose "such a risk of actual bias or prejudgment" that the four justices must recuse themselves as a matter of due process. *Caperton*, 556 U.S. at 883-84, 129 S. Ct. at 2263 (internal quotation marks omitted).

¶40 Except in "rare instances," disqualification issues may be resolved without resort to the Constitution and instead pursuant to codes of judicial conduct. *Caperton*, 556 U.S. at 890, 129 S. Ct. at 2267. Having explained, in some detail, why this case is not one of those "rare instances," we now turn to Montana's Code of Judicial Conduct.

---

[6] Not only is the biasing influence remote, speculative, and contingent, it is not clearly in favor of LR-119 or against it. Legislators assume that the interest the justices allegedly have in this case could only make them biased *against* LR-119, but this is not true. A pecuniary interest in saving the cost of a statewide campaign could just as easily produce a bias *in favor of* LR-119. In any event, as explained, the justices' decision as to the validity of LR-119 will not have the *clear* and *immediate* effect of saving them future campaign costs or enhancing their reelection prospects.

## Code of Judicial Conduct

¶41    The 2008 Montana Code of Judicial Conduct "establishes standards for the ethical conduct of judges and judicial candidates." Mont. Code of Jud. Conduct, Preamble [3]. The Code applies to Supreme Court justices, as well as district court judges and various other judges in the state. Mont. Code of Jud. Conduct, Application I(A). A judge is required to comply with the Code. Mont. Code of Jud. Conduct, Rule 1.1.

¶42    Legislators focus on Rule 2.12(A), which states: "A judge shall disqualify himself or herself in any proceeding in which the judge's impartiality might reasonably be questioned." This includes circumstances where "[t]he judge knows that the judge . . . has more than a de minimis interest that could be substantially affected by the proceeding." Mont. Code of Jud. Conduct, Rule 2.12(A)(2)(c). The interest need not be economic; in fact, "an economic interest in the subject matter in controversy or in a party to the proceeding" is covered separately in Rule 2.12(A)(3). In addition to Rule 2.12(A), Legislators also cite § 3-1-803, MCA, which this Court adopted by order in 1987. The provision states, in pertinent part, that a justice or judge "must not sit or act in any action or proceeding . . . in which he is interested." Section 3-1-803, MCA.

¶43    Based on these provisions, Legislators contend that the four not-presently-retiring justices have more than a de minimis interest in this proceeding—namely, their ability to get reelected. Legislators further contend that LR-119 "directly affects" this interest because LR-119 would require the justices to run for reelection from certain geographical districts, rather than statewide, and this change "could possibly" prevent a justice from getting reelected. Legislators thus argue that "any justice who has even the potential to

run for reelection in the future has a duty to the public and to the court as an institution to disqualify himself or herself from this case" and to "call in district court judges."

¶44 As an initial matter, we again note the implausibility of Legislators' proposal. Like sitting Supreme Court justices, district court judges have "the potential" to run for a seat on this Court in the future, "could possibly" be prevented by LR-119 from getting elected, and thus (under Legislators' theory) have an "interest" in the outcome of this case. That being so, the rule of necessity would apply and none of the justices would be disqualified. *See* ¶ 37, *supra*; *see also* Mont. Code of Jud. Conduct, Rule 2.12 cmt. [3] ("The rule of necessity may override the rule of disqualification.").

¶45 That point aside, Legislators apply an incorrect standard. The issue is not whether the four justices have an interest that would be *directly* affected by this proceeding. It is whether they *know* they have more than a de minimis interest that could be *substantially* affected by the proceeding. Mont. Code of Jud. Conduct, Rule 2.12(A)(2)(c). At this point—roughly two years before Justices Rice and Wheat must decide whether to seek reelection, four years before Justice Cotter must decide, and six years before Justice Baker must decide—it cannot be said that these justices "know" they have more than a de minimis interest in this case. Moreover, even assuming, for the sake of argument, that the justices presently know they have an interest in being reelected, this interest would not be "substantially" affected by this proceeding. It is sheer conjecture whether district elections under LR-119, in lieu of statewide elections under the current system, would help or hinder the justices' chances, just as it is sheer conjecture whether LR-119 would become law if this Court upheld it. What was said above in the due process discussion

29

applies with the same force here: any biasing influence is too remote, too speculative, and too contingent to mandate recusal under Rule 2.12 or § 3-1-803, MCA.

¶46 We note that courts in other jurisdictions have reached similar conclusions about the necessary degree of interest. For example, in *In re Placid Oil Co.*, 802 F.2d 783 (5th Cir. 1986), the court refused "to adopt a rule requiring recusal in every case in which a judge owns stock of a company in the same industry as one of the parties to the case." 802 F.2d at 786. Although the trial judge there held "a large investment in a Texas bank that may be affected by rulings in this case," the court explained that "[a] remote, contingent, and speculative interest" such as this does not create a situation in which the judge's impartiality "might reasonably be questioned." *Placid Oil Co.*, 802 F.2d at 786-87. Similarly, the court in *Bratz v. Bratz*, 495 A.2d 292 (Conn. App. 1985), rejected the defendant's claim that the trial judge had a potential interest in the outcome of the proceeding due to the judge's prior association with a law firm that had represented the plaintiff's father 15 years earlier. The court stated that "[t]he interest in the potential outcome of a case that will disqualify a judge must be a *present* one. It must be direct, certain and immediate . . . ." *Bratz*, 495 A.2d at 295 (emphasis in original); *accord State ex rel. Anaya v. Scarborough*, 410 P.2d 732, 734 (N.M. 1966) ("an 'interest' necessary to disqualify a judge must be a present pecuniary interest in the result, or actual bias or prejudice, and not some indirect, remote, speculative, theoretical or possible interest"); *Am. Rural Cellular, Inc. v. Sys. Commun. Corp.*, 939 P.2d 185, 194 (Utah App. 1997) (in general, to effect the disqualification of a judge, " 'the interest at issue must be direct, certain, and immediate, and not one which is indirect, contingent, incidental, or remote' "

30

(quoting what is now 46 Am. Jur. 2d *Judges* § 90 (2006))); *see also Sturgis v. Skokos*, 977 S.W.2d 217, 223 (Ark. 1998) ("to be disqualifying, the prospective liability, gain, or relief to the judge must turn on the outcome of the suit"); *In re African-American Slave Descendants Litig.*, 307 F. Supp. 2d 977, 989 (N.D. Ill. 2004) ("arguments based on mere speculation are insufficient to warrant recusal").

¶47     In *In re Va. Elec. & Power Co.*, 539 F.2d 357 (4th Cir. 1976), the trial judge was a customer of VEPCO, the plaintiff utility company.  The only interest the judge had in the case was a "remote contingent possibility" of sharing in any refund that might be ordered for all VEPCO customers.  *Va. Elec.*, 539 F.2d at 366.  Specifically,

> *if* VEPCO wins the lawsuit, and *if* it is awarded the entire amount claimed, and *if* the defendants satisfy the judgment, and *if* the Virginia State Corporation Commission decides that VEPCO must return to its customers that part of the award representing increased fuel costs, and when VEPCO makes such an adjustment, then the trial judge, as a customer of VEPCO, would get a refund estimated at between $70 and $100.

*Va. Elec.*, 539 F.2d at 360 (emphases in original).  The court reasoned that

> [s]uch a contingent interest does not presently exist and will not be created by any judgment that may be entered in this litigation.  Neither [the trial judge] nor any other customer of VEPCO will have a claim for refund until, if ever, there occurs an intervening and independent decision of a state agency, the Virginia State Corporation Commission, which regulates public utilities.

*Va. Elec.*, 539 F.2d at 366.  The interest being so "remote and speculative," the court held that recusal was not mandated.  *Va. Elec.*, 539 F.2d at 368-69.

¶48     Likewise, as discussed, there are a variety of contingencies and intervening and independent decisions which make the alleged interest in the present case too remote and speculative:  *if* the justices divine correctly which vote (to uphold LR-119 or to strike it

31

down) will give them the best chances for reelection, *if* the voters pass LR-119 (assuming it is upheld by this Court), *if* the justices decide to seek reelection, and *if* the justices draw opponents in their respective elections, then they might conceivably benefit from having sat on this case. Such a theoretical interest does not require disqualification.

¶49 In reaching this conclusion, we are also mindful of Rule 2.7, which states: "A judge shall hear and decide matters assigned to the judge, except when disqualification is required by Rule 2.12 or other law." The comment to this rule explains:

> Although there are times when disqualification is necessary to protect the rights of litigants and preserve public confidence in the independence, integrity, and impartiality of the judiciary, judges must be available to decide matters that come before the courts. Unwarranted disqualification may bring public disfavor to the court and to the judge personally. The dignity of the court, the judge's respect for fulfillment of judicial duties, and a proper concern for the burdens that may be imposed upon the judge's colleagues require that a judge not use disqualification to avoid cases that present difficult, controversial, or unpopular issues.

Mont. Code of Jud. Conduct, Rule 2.7 cmt. [1].

¶50 In sum, the ultimate question here is whether the four justices' impartiality "might reasonably be questioned." Mont. Code of Jud. Conduct, Rule 2.12(A). The fact that the justices have "the potential" to run for reelection, coupled with the fact that LR-119 "could possibly" hinder their reelection bids, does not establish that the justices' impartiality might reasonably be questioned. Legislators have presented no other legal theories for recusal. And neither Legislators nor the parties have pointed to any actual evidence of bias, prejudice, or unethical conduct on the part of any justice or judge sitting on this case. Absent evidence to the contrary, the "presumption of honesty and integrity in those serving as adjudicators" stands. *Withrow*, 421 U.S. at 47, 95 S. Ct. at 1464.

¶51    Having given thoughtful and detailed consideration to Legislators' concerns under the Due Process Clause, the Code of Judicial Conduct, and § 3-1-803, MCA, we conclude that the four not-presently-retiring justices are not required to recuse themselves.

¶52    ***Issue 2.  Whether Plaintiffs' constitutional challenge to LR-119 is justiciable.***

**Principles of Justiciability and Ripeness**

¶53    As stated above, the judicial power of Montana's courts is limited to "justiciable controversies."  *Plan Helena, Inc. v. Helena Regl. Airport Auth. Bd.*, 2010 MT 26, ¶ 6, 355 Mont. 142, 226 P.3d 567.  In general terms, a justiciable controversy is one that is "definite and concrete, touching legal relations of parties having adverse legal interests" and "admitting of specific relief through decree of conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts, or upon an abstract proposition."  *Chovanak v. Matthews*, 120 Mont. 520, 526, 188 P.2d 582, 585 (1948) (emphasis omitted).  To be justiciable, the parties must have existing and genuine (rather than theoretical) rights or interests, the questions must be presented in an adversary context, and the controversy must be one upon which a court's judgment will effectively and conclusively operate, as distinguished from a dispute invoking a purely political, administrative, philosophical, or academic conclusion.  *Plan Helena*, ¶¶ 7-8; *Montana-Dakota Utils. Co. v. City of Billings*, 2003 MT 332, ¶ 9, 318 Mont. 407, 80 P.3d 1247.  This limitation on judicial power derives primarily from the Montana Constitution, which limits the courts to deciding only cases and controversies, but also from the courts themselves, which have adopted discretionary limitations on the exercise of judicial power for prudential reasons.  *Plan Helena*, ¶ 6; *Greater Missoula Area Fedn. of Early*

*Childhood Educators v. Child Start, Inc.*, 2009 MT 362, ¶ 22, 353 Mont. 201, 219 P.3d 881; *Heffernan v. Missoula City Council*, 2011 MT 91, ¶¶ 31-33, 360 Mont. 207, 255 P.3d 80. While the constitutional case-or-controversy requirement must always be met, prudential rules may be subject to exceptions. *Williamson v. Mont. Pub. Serv. Commn.*, 2012 MT 32, ¶ 28, 364 Mont. 128, 272 P.3d 71.

¶54 The central concepts of justiciability have been elaborated into more specific doctrines—advisory opinions, feigned and collusive cases, standing, ripeness, mootness, political questions, and administrative questions—each of which is governed by its own set of substantive rules. *Greater Missoula*, ¶ 23. At issue here is ripeness, which is concerned with whether the case presents an "actual, present" controversy. *Mont. Power Co. v. Mont. Pub. Serv. Commn.*, 2001 MT 102, ¶ 32, 305 Mont. 260, 26 P.3d 91. The basic purpose of the ripeness requirement is to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements. *Mont. Power Co.*, ¶ 32 (citing *Portman v. County of Santa Clara*, 995 F.2d 898, 902-03 (9th Cir. 1993)). Ripeness is predicated on the central perception that courts should not render decisions absent a genuine need to resolve a real dispute; hence, cases are unripe when the parties point only to hypothetical, speculative, or illusory disputes as opposed to actual, concrete conflicts. *Wis. C., Ltd. v. Shannon*, 539 F.3d 751, 759 (7th Cir. 2008); *see also Mont. Power Co.*, ¶ 32.

¶55 In analyzing ripeness, it is helpful to understand its relationship to standing and mootness. To meet the constitutional case-or-controversy requirement for standing, the plaintiff must clearly allege a past, present, or threatened injury to a property or civil

right, and the injury must be one that would be alleviated by successfully maintaining the action. *Heffernan*, ¶ 33. Note that standing may rest not only on past or present injury, but also on *threatened* injury. *Gryczan v. State*, 283 Mont. 433, 442-43, 942 P.2d 112, 118 (1997); *Missoula City-County Air Pollution Control Bd. v. Bd. of Envtl. Rev.*, 282 Mont. 255, 261-63, 937 P.2d 463, 467-68 (1997). Ripeness and mootness, in turn, can be seen as "the time dimensions of standing." Charles Alan Wright et al., *Federal Practice and Procedure* vol. 13B, § 3531.12, 163 (3d ed., Thomson/West 2008). Ripeness asks whether an injury that has not yet happened is sufficiently likely to happen or, instead, is too contingent or remote to support present adjudication, whereas mootness asks whether an injury that has happened is too far beyond a useful remedy. Wright et al., *Federal Practice and Procedure* § 3531.12, 163, § 3532.1, 383; *see also see also Texas v. United States*, 497 F.3d 491, 496 (5th Cir. 2007) ("In general terms, standing is concerned with whether a proper party is bringing suit, while ripeness is concerned with whether the suit is being brought at the proper time."); *Greater Missoula*, ¶ 23 ("[M]ootness is the doctrine of standing set in a time frame: The requisite personal interest that must exist at the commencement of the litigation (standing) must continue throughout its existence (mootness)." (internal quotation marks omitted)).

¶56 There is both a constitutional and a prudential component to the ripeness inquiry. *Portman*, 995 F.2d at 902; *accord Natl. Park Hospitality Assn. v. Dept. of Int.*, 538 U.S. 803, 808, 123 S. Ct. 2026, 2030 (the ripeness doctrine is drawn both from constitutional limitations on judicial power and from prudential reasons for refusing to exercise jurisdiction); *Mont. Power Co.*, ¶ 32 (the ripeness doctrine is grounded in the

Constitution as well as in judicial prudence). The constitutional component focuses on whether there is sufficient injury, and thus is closely tied to standing. *Portman*, 995 F.2d at 902-03. "Whether framed as an issue of standing or ripeness, the [constitutional] inquiry is largely the same: whether the issues presented are definite and concrete, not hypothetical or abstract." *Wolfson v. Brammer*, 616 F.3d 1045, 1058 (9th Cir. 2010) (internal quotation marks omitted). The prudential component, on the other hand, involves a weighing of the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration. *Wolfson*, 616 F.3d at 1060. The principal consideration under the fitness inquiry is whether there is a factually adequate record upon which to base effective review. *Havre Daily News, LLC v. City of Havre*, 2006 MT 215, ¶ 20, 333 Mont. 331, 142 P.3d 864; *see also Portman*, 995 F.2d at 903. The more the question presented is purely one of law, and the less that additional facts will aid the court in its inquiry, the more likely the issue is to be ripe, and vice-versa. *Havre Daily News*, ¶ 20.

**Application to Present Case**

¶57 At the outset, it is important to note that we are analyzing the question of ripeness based on the facts that existed on April 12, 2012, when we issued our order affirming the District Court's March 20 decision (including the District Court's conclusion that this matter is ripe). As explained, the State requested that we expedite the disposition of this appeal and render our decision by April 13 due to certain statutory deadlines applicable to the preparation of the June 5, 2012 primary election ballots. We thus issued an order on April 12 announcing the disposition of the appeal and stating that our opinion, analysis,

and rationale would follow in due course. The analysis below explains the reasoning behind this Court's conclusion, on April 12, that Plaintiffs' challenge is ripe.

¶58 Starting with the constitutional component of ripeness, the Legislature has placed a referendum on the June 5 ballot concerning the election of Supreme Court justices. If passed, the statutory changes outlined in the referendum are effective immediately. They will change the manner in which justices are elected to Seats 5 and 6 (presently held by Justice Nelson and Justice Morris, respectively), which are up for election this year. The deadline to file as a candidate for those seats was March 12. While all registered voters in the state may vote in the June primary election for the candidates running for Seats 5 and 6, only registered voters in the Fifth and Sixth Supreme Court districts, respectively, will be permitted to vote for those seats in the November general election (if LR-119 is adopted). Plaintiffs challenge LR-119 as impermissibly amending the constitutionally established qualifications for, and selection of, Supreme Court justices by creating a residency requirement and thereby disenfranchising Plaintiffs. They allege a threatened injury because LR-119, should it pass, will deprive them of their right to vote for each seat on the Supreme Court. For those Plaintiffs who do not reside in the Fifth and Sixth Supreme Court districts, the disenfranchisement will occur this election cycle. The issues presented are definite and concrete, not hypothetical or abstract, and this case thus presents a controversy in the constitutional sense. *Cf. Air Pollution Control Bd.*, 282 Mont. at 262-63, 937 P.2d at 468 ("potential economic harm" is sufficient to establish a threatened injury); *Gryczan*, 283 Mont. at 443-44, 942 P.2d at 118-19 (although the challenged deviate-sexual-conduct statute had never been enforced against consenting

37

adults and no prosecution under the statute was imminent, plaintiffs established a threatened injury because the statute was only 24 years old, it had been amended as recently as 1991, the Legislature had decided three times in the preceding seven years not to repeal the statute, plaintiffs were the individuals the statute was designed to impact, and there was nothing to prevent a county attorney from enforcing the statute).

¶59    Turning to prudential considerations, we must weigh the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration.  In this regard, this Court has noted that "[j]udicial intervention in referenda or initiatives prior to an election is not encouraged." *Cobb v. State*, 278 Mont. 307, 310, 924 P.2d 268, 269 (1996).  We have reasoned that to effectively protect and preserve the rights which Montanans have reserved to themselves to change the laws or the Constitution through the initiative process, Mont. Const. art. III, § 4, art. XIV, § 9, and to approve or reject by referendum legislative acts (except appropriations of money) and proposed constitutional amendments, Mont. Const. art. III, § 5, art. XIV, § 8, pre-election judicial review should not be routinely conducted.  *State ex rel. Boese v. Waltermire*, 224 Mont. 230, 234, 730 P.2d 375, 378 (1986); *Harper v. Greely*, 234 Mont. 259, 267-68, 763 P.2d 650, 655-56 (1988).  Such deference and restraint do not apply, however, where a challenged measure is facially defective.  In that event, the courts have a duty to exercise jurisdiction and declare the measure invalid.  *See e.g. State ex rel. Steen v. Murray*, 144 Mont. 61, 69, 394 P.2d 761, 765 (1964) (enjoining the Secretary of State from placing on the ballot an initiative that was "unquestionably and palpably unconstitutional on its face"); *State ex rel. Harper v. Waltermire*, 213 Mont. 425, 428, 691 P.2d 826, 828 (1984) (entertaining a

pre-election challenge to an initiative that, on its face, was "beyond the power of initiative granted the people by the Montana Constitution"); *cf. Cobb*, 278 Mont. at 311, 924 P.2d at 270 (affirming an injunction that prohibited the Secretary of State from placing on the ballot a referendum which, if enacted, would leave "an obvious defect in the constitution"); *Harper*, 234 Mont. at 268, 763 P.2d at 656 (declining to intervene in the referendum process prior to the election because plaintiffs had not challenged the text of the referendum as "unconstitutional on its face").[7]  Where a measure is facially defective, placing it on the ballot does nothing to protect voters' rights.  It instead creates a sham out of the voting process by conveying the false appearance that a vote on the measure counts for something, when in fact the measure is invalid regardless of how the electors vote.  Placing it on the ballot would also be a waste of time and money for all involved—putting the Secretary of State, local election officials, and ultimately taxpayers to the expense of the election; putting proponents and opponents to the expense of needless campaigning; and putting voters to the task of deciding a ballot issue which this Court already knows cannot stand even if passed.  Deferring decision to a later date so the measure can go forward is senseless.  It consumes resources with no corresponding benefit.  Nothing in ripeness doctrine mandates such an approach.  Indeed, "the prudential concerns of the ripeness doctrine [are] not implicated" where "the possible constitutional infirmity [is] clear on the face" of the measure.  *Portman*, 995 F.2d at 903.

---

[7] Besides facial invalidity, courts will entertain pre-election challenges where the measure "was not properly submitted under the election laws."  *State ex rel. Mont. Sch. Bd. Assn. v. Waltermire*, 224 Mont. 296, 299, 729 P.2d 1297, 1298 (1986) (citing *State ex rel. Livingstone v. Murray*, 137 Mont. 557, 354 P.2d 552 (1960)); *see also e.g. Montanans for Justice v. State*, 2006 MT 277, 334 Mont. 237, 146 P.3d 759.

¶60     In the present case, the record is factually adequate to enable the court to make the necessary legal determinations. *Havre Daily News*, ¶ 20. The question presented is purely one of law, and no additional facts will aid the court in its inquiry. *Havre Daily News*, ¶ 20. As explained below under Issue 3, the constitutional infirmity is clear on the face of the measure in that LR-119 attempts to amend the Constitution by means of a statutory referendum. Furthermore, as explained under Issue 4, the constitutionally infirm portions of LR-119 cannot be severed from the remainder of the referendum. The issues are fit for judicial decision, and the hardship of withholding consideration of those issues would be great for the reasons just discussed. Accordingly, we conclude that Plaintiffs' challenge to LR-119 is ripe.

¶61     ***Issue 3. Whether LR-119 is constitutionally defective.***

### The Constitutional Provisions

¶62     Article VII, Section 9 of the Montana Constitution specifies the "[q]ualifications" of Supreme Court justice and district court judge. It states:

> A citizen of the United States who has resided in the state two years immediately before taking office is eligible to the office of supreme court justice or district court judge if admitted to the practice of law in Montana for at least five years prior to the date of appointment or election. Qualifications and methods of selection of judges of other courts shall be provided by law.

Mont Const. art. VII, § 9(1). Thus, to be eligible to the office of Supreme Court justice or district court judge, the person must (1) be a citizen of the United States, (2) have resided in Montana for two years immediately before taking office, and (3) have been admitted to the practice of law in Montana for at least five years prior to the date of

40

appointment or election. Article VII, Section 9(1) contemplates that the qualifications for these offices are dictated solely by the Constitution. This much is apparent from the last sentence of Article VII, Section 9(1), which states that "[q]ualifications and methods of selection of judges of *other* courts shall be provided *by law*" (emphases added), a clear indicator that the Legislature may establish the qualifications and methods of selection of judges of other courts, but the qualifications and methods of selection of Supreme Court justices and district court judges are set by the Constitution alone and consist of the foregoing three criteria—no more, no less. Even without the last sentence, however, this Court has held that the Legislature may not add to or subtract from the constitutional qualifications to hold a particular office.[8]

¶63 In addition to Section 9(1), certain other sections of Article VII are pertinent here. Section 1 mandates three types of courts—"one supreme court, district courts, [and] justice courts"—and permits the Legislature to establish "other courts." The creation of judicial districts is addressed in Section 6. Section 6(1) directs the Legislature to "divide

---

[8] *See e.g. State ex rel. Anaconda Copper Mining Co. v. Clancy*, 30 Mont. 529, 537, 77 P. 312, 315 (1904) ("It is elementary that the legislature cannot impose any additional conditions to those enumerated [in the Constitution] as a prerequisite to any man's holding the office of district judge . . . ."); *State ex rel. Chenoweth v. Acton*, 31 Mont. 37, 44, 77 P. 299, 302 (1904) ("The Constitution has spoken, and it has prescribed the qualifications required of a county superintendent. The legislature may not supplement the constitutional pronouncement upon this subject."); *State ex rel. Palagi v. Regan*, 113 Mont. 343, 357, 126 P.2d 818, 826 (1942) ("Since the provisions of the Constitution are conclusive upon the legislative power, the people under their reserved initiative power are no less subject to it than is the legislature; thus, prior to the amendment of Article IX, section 10, the people had no more power, by initiative measure, to prescribe additional qualifications for county superintendents of schools than the legislature had." (citations omitted)); *see also Gallatin County v. McClue*, 222 Mont. 201, 204-05, 721 P.2d 338, 340-41 (1986).

the state into judicial districts and provide for the number of judges in each district," with each district "formed of compact territory and . . . bounded by county lines." Although the Legislature may change the number and boundaries of judicial districts and the number of judges in each district, Section 6(2) states that "no change in boundaries or the number of districts or judges therein shall work a removal of any judge from office during the term for which he was elected or appointed." Section 5 addresses justices of the peace. Section 5(1) specifies that at least one justice of the peace shall be elected "in each county," with qualifications "provided by law." Section 9(4) requires Supreme Court justices—i.e., persons who have been elected to the office of Supreme Court justice—to reside "within the state." In contrast, Section 9(4) provides that, during his or her term of office, a district court judge shall reside "in the district" in which the judge was elected or appointed, and a justice of the peace shall reside "in the county" in which the justice of the peace was elected or appointed. Section 9(4) states that the residency requirement for "every other judge" must be provided by law.

¶64 The language and structure of these sections demonstrate that the Constitution intends Supreme Court justices to be elected and serve on a statewide basis, district court judges to be elected and serve on a district-wide basis, and justices of the peace to be elected and serve on a countywide basis.[9] When a justice or judge is to be selected from a discrete geographic area, the Constitution states that requirement expressly—as it does

---

[9] There are two exceptions. First, as noted earlier, a district court judge may be substituted for a Supreme Court justice in the event of disqualification or disability. Mont. Const. art. VII, § 3(2). Second, the Chief Justice may assign district court judges and other judges "for temporary service from one district to another, and from one county to another." Mont. Const. art. VII, § 6(3).

with district court judges and justices of the peace. The election of representatives and senators from "districts" is likewise explicit in the Constitution. *See* Mont. Const. art. V, §§ 4, 14. With respect to Supreme Court justices, however, the Constitution could, but does not, specify district elections. To the contrary, the residency requirements in Section 9(4) plainly contemplate that Supreme Court justice, district court judge, and justice of the peace are "state," "district," and "county" offices, respectively. This conclusion is consistent with the constitutional history discussed later in this Opinion. *See* ¶¶ 80-81, *infra*. As explained there, the 1972 Constitutional Convention delegates debated whether justices and judges should be elected, appointed, or some combination of the two, but the assumption of all who spoke on the question was that, under whatever system the delegates finally adopted, Supreme Court justices would be selected on a statewide basis and district court judges would be selected on a district-specific basis. The Constitutional Convention record thus supports our "structural" analysis of Article VII.

¶65    This structure is consistent with the Supreme Court's function. Under Article VII, Section 2, the Supreme Court has statewide appellate jurisdiction, general supervisory control over "all other courts," authority to make rules governing practice and procedure for "all other courts," and authority to make rules governing admission to the bar and the conduct of its members. Given this statewide jurisdiction, it would be incongruous to interpret the Constitution as contemplating a Supreme Court made up of justices who are elected from districts and implicitly "represent" regional interests. Such an interpretation would be inimical to the judicial function.

> Courts are not representative bodies. They are not designed to be a good reflex of a democratic society. Their judgment is best informed, and therefore most dependable, within narrow limits. Their essential quality is detachment, founded on independence. History teaches that the independence of the judiciary is jeopardized when courts become embroiled in the passions of the day and assume primary responsibility in choosing between competing political, economic and social pressures.

*Dennis v. United States*, 341 U.S. 494, 525, 71 S. Ct. 857, 875 (1951) (Frankfurter, J., concurring in affirmance of the judgment). Legislative and executive officials serve in representative capacities, as agents of the people, whose primary function is to advance the interests of their constituencies. Judges, in contrast,

> are not political actors. They do not sit as representatives of particular persons, communities, or parties; they serve no faction or constituency. "[I]t is the business of judges to be indifferent to popularity." [*Chisom v. Roemer*, 501 U.S. 380, 401 n. 29, 111 S. Ct. 2354, 2367 n. 29 (1991)] (internal quotation marks omitted). They must strive to do what is legally right, all the more so when the result is not the one "the home crowd" wants. Rehnquist, Dedicatory Address: Act Well Your Part: Therein All Honor Lies, 7 Pepperdine L. Rev. 227, 229-300 (1980). Even when they develop common law or give concrete meaning to constitutional text, judges act only in the context of individual cases, the outcome of which cannot depend on the will of the public. See [*W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 638, 63 S. Ct. 1178, 1185-86 (1943)] ("One's right to life, liberty, and property, to free speech, a free press, freedom of worship and assembly, and other fundamental rights may not be submitted to vote; they depend on the outcome of no elections.").

*Republican Party of Minn. v. White*, 536 U.S. 765, 805-06, 122 S. Ct. 2528, 2551 (2002) (Ginsburg, Stevens, Souter, & Breyer, JJ., dissenting) (first brackets in original). The obligation of Supreme Court justices is to interpret and apply the law on a uniform basis statewide. The requirements and protections of the Constitution and the law do not vary from one county or district to another. They are the same whether one is from Yaak, Broadus, Wisdom, or Plentywood. Ethical rules do not permit judges to "represent"

particular constituencies or interest groups. *See* Mont. Code of Jud. Conduct, Rule 2.2 (Impartiality and Fairness), Rule 2.3 (Bias, Prejudice, and Harassment). These principles are implicit in the constitutional design, which establishes the office of Supreme Court justice as one subject to selection by electors statewide.

## LR-119's Amendments

¶66 Current statutes are consistent with Article VII. Section 3-2-102(1), MCA, states that a person is not eligible for the office of Supreme Court justice "unless the person is a citizen of the United States, has resided in the state 2 years immediately before taking office, and has been admitted to practice law in Montana for at least 5 years prior to the date of appointment or election." Section 3-2-102(2), MCA, states that Supreme Court justices must reside "within the state" during their terms of office. And § 3-2-101, MCA, states that Supreme Court justices are elected by the qualified electors of "the state at large." LR-119 would amend this system in two ways.

¶67 First, LR-119 would create new qualifications for the office of Supreme Court justice. Specifically, it would add the following italicized language to § 3-2-102, MCA:

> (1) A person is not eligible for the office of justice of the supreme court unless the person is a citizen of the United States, has resided in the state 2 years immediately before taking office, and has been admitted to practice law in Montana for at least 5 years prior to the date of appointment or election.
> (2) Justices of the supreme court must reside within the state during their terms of office. *Once elected from a district, a justice is not required to reside within the district during the justice's service in office.*
> (3) *A supreme court justice must, at the time of initial election, be a qualified elector of the supreme court district from which the justice is elected. A supreme court justice appointed to fill a vacancy must, at the time of appointment, be a qualified elector of the same initial supreme court district as the justice being replaced, and in an election following an*

*appointment, the elected justice must be a qualified elector of the initial district.*

LR-119 (SB 268), § 2. Hence, in addition to (1) being a citizen of the United States who (2) has resided in Montana for two years immediately before taking office and (3) has been admitted to practice law in Montana for at least five years prior to the date of appointment or election, the person would also have to (4) "be a qualified elector" of the Supreme Court district from which the person is elected or appointed.

¶68 The Constitution defines "qualified elector" as "[a]ny citizen of the United States 18 years of age or older who meets the registration and residence requirements provided by law . . . ." Mont. Const. art. IV, § 2; *see also* § 13-1-101(10), MCA (" 'Elector' means an individual qualified to vote under state law."). Among the qualifications to vote, a person must be "registered as required by law" and be "a resident . . . of the county in which the person offers to vote for at least 30 days." Section 13-1-111(1)(a), (c), MCA. Thus, in requiring the person to be a "qualified elector of the supreme court district," LR-119 would effectively create two new qualifications for Supreme Court justice: at the time of election or appointment, the justice (a) must be registered to vote and (b) must be a resident not merely of "the state," but of *a specific portion of* the state—specifically, a county within the Supreme Court district from which the justice is elected or appointed. We agree with the District Court that LR-119's attempt to add these qualifications is unconstitutional. The problem is not that LR-119 would amend § 3-2-102, MCA. The problem, rather, is that the amendments to this statute would effectively amend the Constitution. As we have stated, when the Constitution has prescribed the qualifications

required to hold a particular office, neither the Legislature nor the people have the power to supplement the constitutional pronouncement by prescribing additional qualifications. *Anaconda Copper Mining*, 30 Mont. at 537, 77 P. at 315; *Chenoweth*, 31 Mont. at 44, 77 P. at 302; *Palagi*, 113 Mont. at 357, 126 P.2d at 826. To be sure, the Constitution is clear that the right and power of government derives from and originates with the people, and the people may alter the Constitution whenever they deem it necessary.[10] Yet, while the people may amend the Constitution, they may not violate it in the process. The Constitution prescribes the specific methods for making amendments. *See* Mont. Const. art. XIV, §§ 1, 2, 8, 9. Statutory measures are not one of the constitutionally allowed methods. Accordingly, LR-119's attempt to create new qualifications for Supreme Court justice by means of a statutory referendum is facially unconstitutional.

¶69 Second, LR-119 would alter the structure of the Supreme Court. It would revise § 3-2-101, MCA, to delete the language "[the justices] are elected by the qualified electors of the state at large" and replace it with "[each justice is] elected from a separate district of the state" as provided in Section 3. LR-119 (SB 268), § 1. Section 3 of the referendum defines the Supreme Court districts. Thus, rather than statewide elections, LR-119 would mandate district-based elections.

---

[10] Mont. Const. art. II, § 1 ("**Popular sovereignty.** All political power is vested in and derived from the people. All government of right originates with the people, is founded upon their will only, and is instituted solely for the good of the whole."); Mont. Const. art. II, § 2 ("**Self-government.** The people have the exclusive right of governing themselves as a free, sovereign, and independent state. They may alter or abolish the constitution and form of government whenever they deem it necessary.").

¶70 In many respects, LR-119's proposed system for selecting justices is identical to the Constitution's existing system for selecting senators and representatives. Article V, Section 14(1) provides that "[t]he state shall be divided into as many districts as there are members of the house, and each district shall elect one representative." LR-119 likewise provides that the state shall be divided into seven districts (the number of Supreme Court justices) and specifies that "[t]here must be one supreme court justice selected from each district." LR-119 (SB 268), § 3(1), (2). Article V, Section 14(1) provides that "[e]ach district shall consist of compact and contiguous territory" and "[a]ll districts shall be as nearly equal in population as is practicable." LR-119 likewise provides that "[t]he legislature shall review the districts after each decennial census for purposes of maintaining districts with approximately equal populations while following county lines." LR-119 (SB 268), § 3(3). Article V, Section 4 requires a candidate for the Legislature to "be a resident of the county if it contains one or more districts or of the district if it contains all or parts of more than one county" for six months next preceding the general election. LR-119 likewise requires a candidate for the Supreme Court to be a qualified elector (i.e., registered voter, and resident for at least 30 days) of the district from which the candidate is elected. LR-119 (SB 268), §§ 1, 2. Essentially, then, LR-119 would transform the Supreme Court into a representative body identical to the Legislature in the method of selection, but tasked with a judicial function instead of a legislative function. Notably, the State characterizes "the intent of the law" as being "to tie Justices to the districts from which they are elected." LR-119 also would eliminate the right presently held by all Montana voters to select all seven justices of the Supreme Court. Each voter

would have the right to select only the one justice whose seat corresponds with the voter's district.

¶71 As with the attempt to add qualifications to the office of Supreme Court justice, however, this attempt to alter the structure of the Supreme Court by making it into a representative body composed of members elected from districts is likewise facially unconstitutional. Neither the Legislature nor the people have the power to alter the constitutionally established structure of government by means of a statutory referendum. Again, such amendments to the Constitution must be made through one of the methods permitted by the Constitution itself. *See* Mont. Const. art. XIV, §§ 1, 2, 8, 9.

¶72 The State argues two theories for sustaining LR-119. We address these in turn.

**The State's Article VII, Section 8(1) Theory**

¶73 First, the State contends that LR-119 "does not impermissibly add to or change" the Constitution, but instead "implements" the Constitution pursuant to Article VII, Section 8(1), which states: "Supreme court justices and district court judges shall be elected by the qualified electors as provided by law." In the State's view, the "as provided by law" clause permits the statutory creation of electoral districts in which Supreme Court candidates must reside and from which the justices must be elected.

¶74 We disagree with the State's reading of this provision. For starters, Article VII, Section 8, which is titled "Selection," does not purport to address the qualifications of Supreme Court justice. Those are covered exclusively in Article VII, Section 9, which is titled "Qualifications." Significantly, there are a number of provisions in the Constitution explicitly granting the Legislature authority to set the "qualifications" for certain public

49

offices.[11]  Article VII, Section 8(1), however, is not one of them.  Hence, this provision is not authority for LR-119's addition of qualifications (i.e., voter-registration and residency requirements) to the office of Supreme Court justice.

¶75    Nor is Article VII, Section 8(1) authority to convert the Supreme Court itself from a statewide elected body into a district-based representative body.  As adopted in 1972, Article VII, Section 8 provided that:  (1) vacancies on the Supreme Court or a district court shall be filled by nomination of the Governor or the Chief Justice, and the nomination shall be confirmed by the Senate, but if the nomination is made while the Senate is not in session, then the nomination shall be effective as an appointment until the end of the next session; (2) at the first election after Senate confirmation, and at the election before each succeeding term of office, the name of the incumbent justice or judge shall be placed on the ballot, either for a contested election if there is an opposing candidate, or for the voters to approve or reject the incumbent justice or judge if there is no election contest; and (3) if an incumbent does not run, then there shall be an election for the office.

---

[11] *See e.g.* Mont. Const. art. VII, § 5(1) ("There shall be elected in each county at least one justice of the peace with qualifications, training, and monthly compensation provided by law."); Mont. Const. art. VII, § 9(1) ("Qualifications and methods of selection of judges of other courts [i.e., courts other than the Supreme Court and the district courts] shall be provided by law."); Mont. Const. art. VI, § 3(3) ("The superintendent of public instruction shall have such educational qualifications as are provided by law."); Mont. Const. XI, § 3(2) ("The terms, qualifications, duties, and compensation of those [county government] offices shall be provided by law."); Mont. Const. art. IV, § 4 (except for those public offices whose qualifications are specified in the Constitution, the only qualifications to hold a public office are that the person be a qualified elector and not under state supervision for a felony conviction, but the Legislature "may provide additional qualifications" for such office).

¶76 In 1991, the 52nd Montana Legislature passed House Bill 353 (HB 353), which submitted to the electors various amendments to Article VII, Section 8. *See* Laws of Montana, 1991, ch. 475. Representative Bill Strizich introduced HB 353 in the Legislature, at the request of then-Secretary of State Mike Cooney, to close a perceived "loophole" in Article VII, Section 8. The issue was brought to the fore when Justice Gulbrandson retired from this Court on August 31, 1989. His seat (Seat 1) was set to expire on January 6, 1991. Governor Stephens nominated District Court Judge Diane Barz to fill the vacancy. The Governor also nominated Maurice Colberg Jr. to fill a similar vacancy on the Thirteenth Judicial District Court and Larry W. Moran to fill a similar vacancy on the Eighteenth Judicial District Court. Since the Senate was not in session at the time, it did not consider confirmation of these nominations. On March 14, 1990, Gene Huntley attempted to file for Seat 1 (then held by Justice Barz); however, the Secretary of State rejected Huntley's declaration based on a 1987 opinion of the Attorney General (42 Op. Atty. Gen. Mont. No. 31) which concluded that no election for a judicial position can occur until the Senate has confirmed a serving nominee. The case ultimately reached this Court, which agreed with the Attorney General and held that a nominee for Supreme Court justice or district court judge "need not stand for election until the next election after the Senate's confirmation of the nominee." *State ex rel. Racicot v. First Jud. Dist. Ct.*, 243 Mont. 379, 391, 794 P.2d 1180, 1187 (1990). Interpreting Article VII, Section 8, the Court concluded that

> the general constitutional rule is that appointees and nonappointees shall stand for contested and uncontested elections at the general elections prior to the expiration of each judicial term. The exception to that general rule

51

provides that when the Senate has not had an opportunity to confirm a nominee, the nominee must stand for election for the first time at the next election following Senate confirmation.

*Racicot*, 243 Mont. at 391, 794 P.2d at 1187. Hence, because the Senate had not yet considered the nominations of Justice Barz and Judges Colberg and Moran, the Secretary of State was not required to place their offices on the 1990 ballot. Presumably, Senate confirmation would occur when the Legislature next met in 1991, and the first elections for these positions would occur in 1992. This Court held that the resulting "holdover" situation (where a nominee could serve past the expiration of the predecessor's term) was mandated by the Constitution. *Racicot*, 243 Mont. at 385-86, 794 P.2d at 1183-84. Nevertheless, the Court suggested that "it would be wise for the Legislature to consider amendment of the Constitution" given "the potential for unreasonable results and even abuses of the judicial selection system" inherent in the scheme created by Article VII, Section 8. *Racicot*, 243 Mont. at 391, 794 P.2d at 1187.

¶77 That is the problem to which the Section 8 amendments were addressed. HB 353 added what is now Section 8(1) and amended other parts of Section 8 for the specific purpose of ensuring that appointees would face election in a timely manner and that no appointee could serve past the expiration of his or her predecessor's term without standing for election. Notably, Representative Strizich indicated at the February 1, 1991 hearing of the House Judiciary Committee that the intent of HB 353 was "to protect the voter's right to vote for Supreme Court and District Court judges." Likewise, contrary to the State's and Legislators' arguments in the present case, Secretary of State Cooney noted at that same hearing and at the March 26, 1991 hearing of the Senate Judiciary

Committee: "In 1990, *every voter in this state* was denied the right to vote for their candidate of choice for a Supreme Court seat. . . . House Bill 353 will strengthen our Constitution and it will affirm the right of *all Montanans* to vote for those who govern our state." (Emphases added.) The purpose of the measure, Cooney explained, was "to amend the constitution to mandate the election of judges and justices at the times prescribed by law." After voters approved the measure in November 1992 (*see* Laws of Montana, 1993, Ballot Issues, Const. Amend. No. 22), the Legislature amended certain statutes specifically addressed to these issues (*see* Laws of Montana, 1993, ch. 377 (amending §§ 3-1-1013 and -1014, MCA)).

¶78 Thus, HB 353 was a *timing* measure. Nothing in the plain language of Article VII, Section 8 (as amended) or in the history of HB 353 indicates that the 1992 amendments were intended—or even contemplated—to grant the Legislature power to convert the Supreme Court from an institution composed of members elected on a statewide basis into a representative body composed of members elected from separate districts. The State is mistaken in its claim that Section 8(1) grants such authority. If anything, the proponents' views indicate that HB 353 was intended to *strengthen* the right of "all Montanans" to vote for Supreme Court justices, not take that right away.

### The State's Con-Con Theory

¶79 The State's second theory is premised on the records from the 1972 Constitutional Convention (Con-Con). In this regard, Plaintiffs' position is that the relevant language of Article VII is unambiguous and, thus, resort to the Con-Con records is unnecessary. But to the extent the transcripts of the Con-Con debates may be considered, Plaintiffs argue

53

that the delegates' remarks reflect an intention to broadly empower the electorate to vote for Supreme Court justices on a statewide basis. In response, the State asserts that "[t]he individual delegates' statements . . . should not be considered by the Court." Instead, the State focuses on the fact that Delegate David L. Holland's proposed amendment to Article VII did not pass. Having reviewed the relevant portion of the Con-Con record, however, we disagree with the significance the State attributes to the failure of Delegate Holland's amendment.

¶80 As discussed in *Racicot*, 243 Mont. at 387-88, 794 P.2d at 1184-85, the Judiciary Committee presented the delegates with two different proposals. The majority proposal provided for the selection of justices and judges primarily through general elections, while the minority proposal provided for the selection of justices and judges through a system of appointment with an approval-or-rejection election for each succeeding term. The delegates voted to adopt the minority proposal, but then, in a series of debates and amendments before the committee of the whole, broadened its election provisions. In the midst of those debates, Delegate Holland moved to amend part of the minority proposal by substituting the following language taken from Section 6 of the majority proposal: "The justices of the Supreme Court shall be elected by the electors of the state at large, and the term of the office of the justices of the Supreme Court, except as in this Constitution otherwise provided, shall be six years." *See* Montana Constitutional Convention, Verbatim Transcript, Feb. 29, 1972, p. 1086; Montana Constitutional Convention, Judiciary Committee Proposal, Feb. 17, 1972, vol. I, p. 487. Ultimately, this amendment failed by a narrow margin. Montana Constitutional Convention, Verbatim

54

Transcript, Feb. 29, 1972, p. 1099. And from this fact, the State posits that "the attempt to constitutionally require the election of Supreme Court Justices at-large was rejected by the convention."

¶81 We cannot agree with this inference. Delegate Holland's amendment was the third of five proposals that were placed before the delegates concerning the selection of Supreme Court justices and district court judges. The sole question being debated at the time was whether justices and judges should be elected, appointed, or some combination of the two. There is no indication in the delegates' discussion that they objected to the "state at large" portion of Delegate Holland's proposal. To the contrary, the assumption of all who spoke on the question was that, under whatever system the delegates finally adopted, Supreme Court justices would be selected on a statewide basis and district court judges would be selected on a district-specific basis. A careful reading of the transcript reveals that Delegate Holland's amendment was rejected because a majority of the delegates favored an approach involving merit-based appointments with the justice or judge having to stand for election at each succeeding term. It would be extraordinary to conclude that the delegates intended by their vote on Delegate Holland's amendment to "reject" Montana's decades-old system of electing Supreme Court justices by the electors of the state at large, without even a single word by any of the delegates directed to this issue and without any language to this effect in Constitution itself.

¶82 In sum, LR-119 would create new qualifications for the office of Supreme Court justice by requiring each justice to be a "qualified elector"—i.e., a registered voter and resident—of the Supreme Court district from which the justice is elected or appointed. In

addition, LR-119 would alter the structure of the Supreme Court by converting it from a statewide elected institution into a district-based representative body. Correspondingly, LR-119 would eliminate the right presently held by all Montana voters to select all seven justices of the Supreme Court. Legislators argue extensively in their amicus brief that the process of electing justices from smaller, local districts from around the state has "inherent value." However, this case is not about the wisdom or "value" of the changes proposed by LR-119. The point, rather, is that these changes constitute amendments to the Constitution, which cannot be achieved by means of a statutory referendum. Accordingly, we hold that LR-119 is facially unconstitutional.

¶83 *Issue 4. Whether the constitutionally infirm provisions of LR-119 can be severed from the remainder of the referendum.*

¶84 As noted at the outset, LR-119 would effect three changes concerning the qualifications and selection of Supreme Court justices. First, it would require a candidate to be a qualified elector of the district from which the candidate is elected. Second, it would require that each justice be elected from a separate district and would correspondingly take away the present right of all Montana voters to select all seven justices. Third, it would change the method of selecting the chief justice from a statewide election to a selection by the seven justices from among their number. Based on the analysis under Issue 3, the first and second of these changes are facially unconstitutional. Plaintiffs have not challenged the third change concerning the selection of the chief justice, and thus we shall assume (without deciding) that this change is not unconstitutional. The question, then, is whether the provisions creating new

56

qualifications and district-based elections can be severed from the provisions modifying how the chief justice is selected.

¶85   In this regard, the State points out that LR-119 contains a severability section, which states: "If a part of [this act] is invalid, all valid parts that are severable from the invalid part remain in effect. If a part of [this act] is invalid in one or more of its applications, the part remains in effect in all valid applications that are severable from the invalid applications." LR-119 (SB 268), § 6 (brackets in original). The State and Legislators argue that severability could be accomplished here and that the remainder of the referendum could go to the electorate. Plaintiffs, on the other hand, argue that the District Court got it right when it concluded that the invalid portions of the referendum cannot be severed from the rest. We agree with Plaintiffs.

¶86   It is a well-established principle that a statute is not destroyed in toto because of an improper provision, unless such provision is necessary to the integrity of the statute or was the inducement to its enactment. *Hill v. Rae*, 52 Mont. 378, 389-90, 158 P. 826, 831 (1916); *State ex rel. Evans v. Fire Dept. Relief Assn.*, 138 Mont. 172, 178, 355 P.2d 670, 673 (1960); *Mont. Auto. Assn. v. Greely*, 193 Mont. 378, 399, 632 P.2d 300, 311 (1981); *Sheehy v. Pub. Employees Ret. Div.*, 262 Mont. 129, 141, 864 P.2d 762, 770 (1993); *Finke v. State ex rel. McGrath*, 2003 MT 48, ¶ 25, 314 Mont. 314, 65 P.3d 576; *Oberson v. U.S. Dept. of Agric.*, 2007 MT 293, ¶ 26, 339 Mont. 519, 171 P.3d 715. "If, when an unconstitutional portion of an act is eliminated, the remainder is complete in itself and capable of being executed in accordance with the apparent legislative intent, it must be

sustained." *Mont. Auto. Assn.*, 193 Mont. at 399, 632 P.2d at 311 (citing *Gullickson v. Mitchell*, 113 Mont. 359, 375, 126 P.2d 1106, 1114 (1942)).

¶87    Applying these principles, the District Court reviewed the language and legislative history of LR-119 and found that the Legislature did not pass LR-119 for the purpose of changing the method of selecting the chief justice.  In other words, this was not the "inducement" for LR-119's enactment, and thus "judicial severability policy" does not apply. *See Sheehy*, 262 Mont. at 141, 864 P.2d at 770.  The District Court also expressed concern with the State's and Legislators' suggestion that the court should somehow revise LR-119 to edit out major portions in an effort to salvage some small part that might pass constitutional muster.  The court reasoned that the principle of separation of powers commits the drafting of legislation to the Legislature, not the courts. The court noted that in reviewing challenges to ballot initiatives proposed by the electorate, a district court has authority to rewrite the ballot statements on the proposed initiatives but not to rewrite the initiatives themselves. *See* § 13-27-316, MCA.  Here, the court stated, "[w]ithout clear judicial legislation, this Court cannot re-write the remaining parts of this referendum.  To do so would entail completely re-writing the title, the ballot statement, the statements of implication, and the text of the referendum itself.  There is no constitutional or statutory authority for such a revision."  In sum, the District Court concluded that if it "severed the invalid parts, the remaining provisions are neither a complete statutory scheme nor do they reflect what induced the Legislature to pass LR-119 in the first place."

¶88　Neither the State nor Legislators refute the District Court's reasoning. Nor do they suggest that it would be proper for the courts to rewrite this referendum in order to salvage some small part of it. Legislators maintain that the change to how the chief justice is selected is "independent" of the other changes effected by LR-119 and is itself constitutional. However, even assuming this to be true for the sake of argument, we agree with the District Court that changing how the chief justice is selected was not the inducement for passing LR-119.[12] Furthermore, as the District Court noted, salvaging this part of the referendum would involve completely rewriting the title, the ballot statement, the statements of implication, and the text of the referendum itself—which the courts are not situated to do. For these reasons, we conclude that the constitutionally infirm portions of LR-119 cannot be severed from the remainder of the referendum.

**CONCLUSION**

¶89　Based on the foregoing analysis, we conclude and hold that Justices Rice, Wheat, Cotter, and Baker are not required to recuse themselves from sitting on this case; that this case presents a justiciable controversy; that LR-119's proposed amendments to the qualifications and structure of the Supreme Court are facially unconstitutional; and that

---

[12] Indeed, SB 268's title does not even mention this facet of the measure: "AN ACT REQUIRING THAT SUPREME COURT JUSTICES BE ELECTED AND APPOINTED FROM SUPREME COURT DISTRICTS; ESTABLISHING SUPREME COURT DISTRICTS; PROVIDING THAT THE PROPOSED ACT BE SUBMITTED TO THE QUALIFIED ELECTORS OF MONTANA AT A SPECIAL ELECTION TO BE HELD CONCURRENTLY WITH THE 2012 PRIMARY ELECTION; AMENDING SECTIONS 3-2-101 AND 3-2-102, MCA; AND PROVIDING AN IMMEDIATE EFFECTIVE DATE AND AN APPLICABILITY DATE." Laws of Montana, 2011, ch. 203.

the provision regarding the selection of the chief justice is not severable from LR-119's

constitutionally infirm provisions. Accordingly, the District Court's decision is affirmed.

¶90    Affirmed.


                                        /S/ JAMES C. NELSON
                                        Acting Chief Justice


We Concur:

/S/ MICHAEL E WHEAT
/S/ PATRICIA COTTER
/S/ JIM RICE


/S/ THOMAS M. McKITTRICK
District Court Judge Thomas M. McKittrick
sitting for Chief Justice Mike McGrath


/S/ KAREN S. TOWNSEND
District Court Judge Karen S. Townsend
sitting for Justice Brian Morris



Justice Beth Baker, concurring in part and dissenting in part.

¶91    I join the Court's opinion and holding with respect to Issue 1.  I dissent with

respect to Issue 2, and I would not reach Issues 3 or 4.

¶92    As indicated in the Court's order of April 12, 2012, I would reverse the District

Court's decision to decertify LR-119 from the June 5, 2012 ballot and hold this appeal in

abeyance pending the results of that election.  I would not reach the constitutional

challenge absent approval of the measure by a majority of voters casting ballots in the

special election held for that purpose. Accordingly, I express no opinion on the merits of the constitutional issues or the Court's analysis in that regard.

¶93 We have long recognized "the principle that 'initiative and referendum provisions of the Constitution should be broadly construed to maintain the maximum power in the people.'" *Nicholson v. Cooney*, 265 Mont. 406, 411, 877 P.2d 486, 488 (1994) (quoting *Chouteau County v. Grossman*, 172 Mont. 373, 378, 563 P.2d 1125, 1128 (1977). "A referendum is not a single act, it is a process. That process is not complete until the electorate has spoken." *Harper v. Greely*, 234 Mont. 259, 269, 763 P.2d 650, 656 (1988) (quoting the ruling of then-District Judge Gordon R. Bennett). The Supreme Court is not part of this two-step legislative referendum process. Instead, the Court rules on constitutionality of legislation only if, and after, a duly-enacted law has been challenged. Here, displaying "lack of confidence in the knowledge of the voters," *Mont. Consumer Fin. Ass'n v. State*, 2010 MT 185, ¶ 24, 357 Mont. 237, 238 P.3d 765 (Morris, J., concurring), and contrary to well-established tenets of judicial review, the Court has pre-empted the legislative referendum process to reach the merits of the constitutional issues.

¶94 Although this Court has entertained pre-election challenges to ballot issues, historically we have done so sparingly. We have enjoined placement on the ballot of *citizen-initiated* measures in cases where the measure was "unquestionably and palpably unconstitutional on its face," *State ex rel. Steen v. Murray*, 144 Mont. 61, 69, 394 P.2d 761, 765 (1964), such as an initiative that interfered with the "independent legislative power vested in the legislature" by compelling the legislature "to reach a specific result under threat of confinement and no pay." *State ex rel. Harper v. Waltermire*, 213 Mont.

61

425, 429, 691 P.2d 826, 829 (1984). "[B]ecause of the safeguards already built into the referendum process," *Harper*, 234 Mont. at 268, 763 P.2d at 656, we have been even more sparing in intervening to stop election on a measure referred by the legislature. In *Cobb v. State*, 278 Mont. 307, 309, 924 P.2d 268, 269 (1996), we exercised review over a pre-election challenge to a legislatively-proposed constitutional amendment on the ground that its approval by voters "would leave a defect in the constitution which could not be remedied *except by another election*." (Emphasis added.) Extensive research has produced no other cases in which the Court has enjoined placement of a legislative referendum on the ballot.

¶95    Our decision in *Cobb* was rendered in accordance with a statute in place at the time that allowed a pre-election challenge to an initiative or referendum if it challenged a "constitutional defect in the substance of a proposed ballot issue." Section 3-5-302(6)(a)(ii), MCA (1995). On the other hand, when the legislature has prescribed a specific process for a court challenge to a ballot measure, we have refused to intervene prior to the election if that process was not followed. *State ex rel. Mont. Citizens for the Preservation of Citizens' Rights v. Waltermire*, 224 Mont. 273, 278, 729 P.2d 1283, 1286 (1986). The statutory language under which our authority was exercised in *Cobb* has since been repealed. In its place, the Legislature has expressly preserved "the right to challenge a constitutional defect in the substance of an issue *approved by a vote of the people*." Section 13-27-316(6), MCA (emphasis added).

¶96    Withholding consideration of the alleged constitutional defect in LR-119 until after the election—and then, obviously, only if the measure passed—would comport with

the process set forth in the statute and remain true to the restraint that characterizes our consideration of constitutional challenges. "[T]he constitutional requirement of a 'case or controversy' contemplates real controversies and not abstract differences of opinion." *Greater Missoula Area Fed'n of Early Childhood Educators v. Child Start, Inc.*, 2009 MT 362, ¶ 23, 353 Mont. 201, 219 P.3d 881. Among the categories subsumed in the "case or controversy" requirement are the doctrine of ripeness and the refusal to issue advisory opinions. *Greater Missoula*, ¶ 23. "The doctrine of ripeness 'requires an actual, present controversy, and therefore a court will not act when the legal issue raised is only hypothetical or the existence of a controversy merely speculative.'" *Havre Daily News, LLC v. City of Havre*, 2006 MT 215, ¶ 19, 333 Mont. 331, 142 P.3d 864 (quoting *Mont. Power Co. v. Mont. Pub. Serv. Comm'n*, 2001 MT 102, ¶ 32, 305 Mont. 260, 26 P.3d 91). We have followed the guiding principle that "courts should avoid constitutional issues whenever possible." *Sunburst Sch. Dist. No. 2 v. Texaco, Inc.*, 2007 MT 183, ¶ 62, 338 Mont. 259, 165 P.3d 1079; *Baxter v. State*, 2009 MT 449, ¶ 10, 354 Mont. 234, 224 P.3d 1211. The Court cites to no case in which a court has determined a statute to be ripe for constitutional challenge before it was enacted. Prior to approval by the voters, the constitutional dispute at issue regarding residency qualifications and district elections for Supreme Court justices does not rise above an abstract difference of opinion. Depending on the election results, there may never have been a constitutional issue to consider.

¶97 The Court determines that LR-119 presents unique grounds for pre-election review because of its effect in the current election cycle, observing that the measure threatened to disenfranchise voters outside the Fifth and Sixth Supreme Court Districts. (Opinion

63

¶58.) The Court's concerns, however, conflate the merits of the constitutional issues with the timing of their consideration. The legislature clearly was within its authority to order a special election in conjunction with the June 5 primary election. Mont. Const. art. III, § 6; *State ex rel. Gould v. Cooney*, 253 Mont. 90, 94, 831 P.2d 593, 595 (1992). At that election, all Montana voters would have been given the opportunity to vote on LR-119, and all Montana voters would have been able to vote for all Supreme Court positions on the ballot. If, and only if, LR-119 passed would anyone's right to vote have been affected in the general election. As illustrated by the efficiency with which this appeal was briefed, considered and decided, we easily could have held the appeal in abeyance, awaited certification of the June 5 election results, and decided the case—if necessary—within a few weeks. The only impact may have been a few weeks of lost statewide campaigning time by successful primary candidates, but they are not even parties to the challenge. Ironically, the only "disenfranchisement" of voters results from the Court's decision to remove LR-119 from the ballot.

¶98 The Court's ruling that the measure's facial invalidity requires its immediate consideration also is unconvincing. First, the District Court acknowledged, and the Plaintiffs do not appear to dispute, that not all provisions of LR-119 are facially unconstitutional. The District Court agreed that the Montana Constitution does not prohibit the legislature from creating Supreme Court districts or from having the Chief Justice selected by the other members of the Court. Whether or not these provisions, if constitutional, could be severed from the measure would have been appropriate and better suited for consideration only if the referendum passed and became law.

64

¶99 Finally, the Court holds that it would have been a "waste of time and money" to place the measure on the ballot. (Opinion ¶ 59.) Although I agree that delays in this case, including the State's inexplicable failure to secure a stay of the District Court's decision, were regrettable and have made the process tortuous and more costly than necessary, these types of emergencies are not uncommon in election matters and the court system is equipped to deal with them. I cannot ascribe "no corresponding benefit" (Opinion ¶ 59) to the fulfillment of our Constitution's guarantee of the right of initiative and referendum. The "consum[ption of] resources" in this case (Opinion ¶ 59) is not sufficient to outweigh the people's right to vote. The Court's decision to protect the voters from a measure referred by the legislature is patronizing and elevates judicial economy above respect for the constitutional process and the people's role in it.

¶100 We should decline to interfere with the initiative and referendum process "unless it appears to be absolutely essential." *Mont. Citizens for the Preservation of Citizens' Rights*, 224 Mont. at 276, 729 P.2d at 1285. Because a decision on the constitutional issues could have been rendered quickly following the primary election had the referendum passed, the Court's interference now is not, in my view, "absolutely essential." I dissent.


/S/ BETH BAKER

**LEGISLATIVE REFERENDUM NO. 119**
**BALLOT LANGUAGE**

LEGISLATIVE REFERENDUM NO. 119

AN ACT REFERRED BY THE LEGISLATURE

AN ACT REQUIRING THAT SUPREME COURT JUSTICES BE ELECTED AND APPOINTED FROM SUPREME COURT DISTRICTS; ESTABLISHING SUPREME COURT DISTRICTS; PROVIDING THAT THE PROPOSED ACT BE SUBMITTED TO THE QUALIFIED ELECTORS OF MONTANA AT A SPECIAL ELECTION TO BE HELD CONCURRENTLY WITH THE 2012 PRIMARY ELECTION; AMENDING SECTIONS 3-2-101 AND 3-2-102, MCA; AND PROVIDING AN IMMEDIATE EFFECTIVE DATE AND AN APPLICABILITY DATE.

The Montana Supreme Court is composed of seven justices, one of whom is Chief Justice. Under current law, the justices are elected statewide and each Montanan votes for all seven positions. LR-119 would change existing law so that each justice is elected from one of seven districts of approximately equal population, with the Chief Justice then chosen from the seven by majority vote of the justices. Only Montanans living in each district would vote for their district's justice. Justices must reside in their district when initially elected.

[]      FOR requiring supreme court justices to be elected or appointed from districts with approximately equal populations.

[]      AGAINST requiring supreme court justices to be elected or appointed from districts with approximately equal populations.

1

**THE COMPLETE TEXT OF SENATE BILL NO. 268, REFERRED BY LR-119**

AN ACT REQUIRING THAT SUPREME COURT JUSTICES BE ELECTED AND APPOINTED FROM SUPREME COURT DISTRICTS; ESTABLISHING SUPREME COURT DISTRICTS; PROVIDING THAT THE PROPOSED ACT BE SUBMITTED TO THE QUALIFIED ELECTORS OF MONTANA AT A SPECIAL ELECTION TO BE HELD CONCURRENTLY WITH THE 2012 PRIMARY ELECTION; AMENDING SECTIONS 3-2-101 AND 3-2-102, MCA; AND PROVIDING AN IMMEDIATE EFFECTIVE DATE AND AN APPLICABILITY DATE.

BE IT ENACTED BY THE LEGISLATURE OF THE STATE OF MONTANA:

**Section 1.** Section 3-2-101, MCA, is amended to read:
**"3-2-101. Number, election, and term of office -- selection of chief justice.** (1) The supreme court consists of a chief justice and six associate justices who ~~are elected by the qualified electors of the state at large~~ must be qualified electors of the district from which they are elected, with each member elected from a separate district of the state as provided in [section 3]. Each justice must be elected at the general ~~state elections~~ election next preceding the expiration of the ~~terms~~ term of office of ~~their predecessors, respectively,~~ the justice's predecessor and ~~hold their offices~~ holds office for the term of 8 years from ~~and after~~ the first Monday of January ~~next~~ succeeding ~~their~~ the justice's election.
(2) After the general election in 2016, the chief justice must be selected by the majority vote of the seven justices at the first meeting of the court in each year after a general election."

**Section 2.** Section 3-2-102, MCA, is amended to read:
**"3-2-102. Qualifications and residence.** (1) A person is not eligible for the office of justice of the supreme court unless the person is a citizen of the United States, has resided in the state 2 years immediately before taking office, and has been admitted to practice law in Montana for at least 5 years prior to the date of appointment or election.
(2) Justices of the supreme court must reside within the state during their terms of office. Once elected from a district, a justice is not required to reside within the district during the justice's service in office.
(3) A supreme court justice must, at the time of initial election, be a qualified elector of the supreme court district from which the justice is elected. A supreme court justice appointed to fill a vacancy must, at the time of appointment, be a qualified elector of the same initial supreme court district as the justice being replaced, and in an election following an appointment, the elected justice must be a qualified elector of the initial district."

**Section 3. Supreme court districts defined -- number of judges.** (1) In this state there are seven supreme court judicial districts, distributed as follows:
(a) 1st district: Cascade, Chouteau, Fergus, Golden Valley, Hill, Judith Basin, Liberty, Meagher, Pondera, Teton, and Wheatland Counties;

2

(b) 2nd district: Big Horn, Blaine, Carbon, Carter, Custer, Daniels, Dawson, Fallon, Garfield, McCone, Musselshell, Park, Petroleum, Phillips, Powder River, Prairie, Richland, Roosevelt, Rosebud, Sheridan, Stillwater, Sweet Grass, Treasure, Valley, and Wibaux Counties;

(c) 3rd district: Yellowstone County;

(d) 4th district: Lewis and Clark, Deer Lodge, Granite, Jefferson, Ravalli, Powell, and Broadwater Counties;

(e) 5th district: Flathead, Lincoln, Glacier, Sanders, and Toole Counties;

(f) 6th district: Gallatin, Madison, Beaverhead, and Silver Bow Counties;

(g) 7th district: Missoula, Lake, and Mineral Counties.

(2) There must be one supreme court justice selected from each district.

(3) The legislature shall review the districts after each decennial census for purposes of maintaining districts with approximately equal populations while following county lines.

**Section 4. Transition.** (1) [This act] may not remove any justice that is holding office on [the effective date of this act] during the term for which the justice was elected or appointed. After [the effective date of this act], each sitting associate justice must be assigned to the judicial district that corresponds to the associate justice's current seat number and the chief justice must be assigned to the seventh district.

(2) (a) Except as provided in subsection (2)(b), each supreme court justice who chooses to seek reelection at the end of the justice's current term shall run for reelection in the district to which the justice is assigned under subsection (1).

(b) A sitting justice that chooses to seek election in a district other than the district assigned under subsection (1) may run for election in the district if the justice resigns the justice's current seat effective as of the date the justice files for election in the district to which the justice seeks election.

(3) In the 2012 election, the two candidates receiving the most votes in the primary for each seat up for reelection advance to the 2012 general election for the district that corresponds to the same seat number.

**Section 5. Codification instruction.** [Section 3] is intended to be codified as an integral part of Title 3, chapter 2, and the provisions of Title 3, chapter 2, apply to [section 3].

**Section 6. Severability.** If a part of [this act] is invalid, all valid parts that are severable from the invalid part remain in effect. If a part of [this act] is invalid in one or more of its applications, the part remains in effect in all valid applications that are severable from the invalid applications.

**Section 7. Effective date.** [This act] is effective upon approval by the electorate.

**Section 8. Applicability.** [This act] applies to the election and appointment of supreme court justices to terms that begin on or after [the effective date of this act].

3

**Section 9. Submission to electorate.** [This act] shall be submitted to the qualified electors of Montana at a special election to be held concurrently with the primary election held in the spring of 2012 by printing on the ballot the full title of [this act] and the following:

[]     FOR requiring supreme court justices to be elected or appointed from districts with approximately equal populations.

[]     AGAINST requiring supreme court justices to be elected or appointed from districts with approximately equal populations.

4